**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Rodrigo MEJIA, Defendant–Appellant.**

No. 89–2243.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 28, 1990.

Decided Aug. 2, 1990.

Thomas M. Durkin, James Conway, Joan G. Fickinger, Asst. U.S. Attys., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Loraine A. Ray, Chicago, Ill., for defendant-appellant.

Before BAUER, Chief Judge, POSNER and MANION, Circuit Judges.

MANION, Circuit Judge.

Rodrigo Mejia appeals his convictions for conspiracy to distribute cocaine and possession with intent to distribute cocaine. We affirm.

## I.

Elkin Escobar, a Colombian illegally in New York, began transporting cocaine in 1987. Mejia and Escobar were acquaint-

ances, having met in South America in 1984. In January 1988, while in Chicago delivering cocaine, Escobar met Mejia at Mejia's home in Park Ridge, Illinois. Escobar badly needed money, so he asked Mejia whether he could "move some things"— "some things" meaning cocaine. Mejia indicated he could. In October, Escobar again contacted Mejia. Mejia told Escobar that he needed six kilograms of cocaine. Escobar could not obtain the cocaine himself, so Mejia gave Escobar the beeper number of Amparo Evans, a woman in New York with access to cocaine.

Escobar subsequently contacted Evans. Sometime later (in late October or early November), Mejia flew to New York and met with Escobar at La Guardia Airport. Escobar told Mejia that he had spoken to Evans, and was willing to transport cocaine to Mejia in Park Ridge. On Mejia's instructions, Escobar again contacted Evans, and arranged with Evans to transport six kilograms of cocaine. On November 23, 1988, Evans gave Escobar a white Toyota van containing six kilograms of cocaine in a hidden compartment, and $1,000 in expense money. (Escobar, who charged $500 per kilogram for transporting the cocaine, was to be paid after he delivered it.) Along with his girlfriend, Lina Alvarez, Escobar set off in the van for Park Ridge.

Escobar and Alvarez arrived in Park Ridge on November 24. They drove to Mejia's house, but he was not there so they drove to a nearby motel. At the motel, Escobar phoned Mejia, and the two arranged to meet at Mejia's house, which they did the next day. Escobar told Mejia he had "brought six." Mejia replied, "Very well." Escobar did not actually give Mejia the cocaine at that time because he had to call Evans before handing the cocaine over. As it turned out, Escobar never completed the delivery. After spending the day with Mejia (and being observed, part of that time, by DEA agents who were watching Mejia's house as part of a cocaine trafficking investigation), Escobar and Alvarez drove back to their motel. At about 8:00 p.m., DEA agents approached Escobar and Alvarez in the motel parking lot. Escobar and Alvarez consented to a search of the van. The search uncovered the cocaine in a hidden compartment. Upon finding the cocaine, the agents arrested Escobar and Alvarez.

After securing a police wagon to take Escobar and Alvarez to the DEA office in Chicago, the agents went to Mejia's home. When Mejia came to his door, the agents arrested him. The agents also arrested Mejia's son, Jaime. Before leaving Mejia's home, the agents asked him if he had any valuables. Mejia replied that he had some money. The agents found $1,600, which they seized.

The agents took Mejia and his son to the DEA office in Chicago. At the DEA office, one of the agents asked Mejia if he knew Escobar and Alvarez. Mejia replied "No." The agent then pointed out Escobar and Alvarez, who were being held in the same building, to Mejia, and repeated his question. Mejia again replied, "No."

The following day, DEA agents searched Mejia's home and garage pursuant to a warrant. The search turned up no drugs or drug paraphernalia in Mejia's home. However, in the garage the agents searched a 1979 Oldsmobile Toronado that surveillance agents had seen Mejia driving five days before. In the Toronado, the agents found electronically-operated hidden compartments that could be used for transporting drugs. The compartments, however, were empty, containing neither drugs nor even drug residue.

Three days after Mejia was arrested, DEA agents retrieved from the DEA vault the $1,600 they had seized from Mejia. The agents placed the money in a drawer in one of the desks in the office, and then ordered Rex, a certified narcotics dog, to "fetch dope." Rex sniffed around the office, passing several desks. However, when he came to the desk that contained Mejia's money, Rex stopped and began to scratch at the drawer containing the money, a sign that Rex had detected at least the odor of narcotics. When the drawer was opened, Rex began to scratch at the money.

The government brought a two-count indictment against Mejia, charging him with conspiracy to distribute cocaine, 21 U.S.C. § 846, and possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1). Escobar, who had pleaded guilty, was the government's star witness at trial. The jury also heard testimony from various DEA agents and other witnesses for the government. Jaime Mejia, Mejia's son, testified in his father's behalf, contradicting much, but not all of, Escobar's and the agents' testimony. After hearing all the evidence, the jury found Mejia guilty on both counts.

## II.

■ On appeal, Mejia contends that the evidence was not sufficient to convict him because Escobar's testimony was inherently unreliable. This is so, says Mejia, because Escobar had ample motive to lie. Escobar pleaded guilty and agreed to testify in exchange for the government's agreement to recommend a lenient sentence. Also, Escobar did not implicate Mejia in the conspiracy until after several times stating that Mejia was not involved. Escobar pointed the finger at Mejia only after his attorney had told him that to get a favorable deal, he had to give the government the name of "somebody in Chicago." Because of the unreliability of Escobar's testimony, Mejia asserts that testimony could not support a verdict of guilty beyond a reasonable doubt.

Even assuming that Escobar's testimony was the only evidence that implicated Mejia (it was not, but we need not detail the other evidence that corroborated Escobar), Mejia's sufficiency argument is meritless. We have repeatedly rejected arguments like Mejia's. See, e.g., *United States v. Sophie*, 900 F.2d 1064, 1079 (7th Cir.1990); *United States v. Dunigan*, 884 F.2d 1010, 1013 (7th Cir.1989); *United States v. Muskovsky*, 863 F.2d 1319, 1323–24 (7th Cir. 1988). Credibility is for the jury, not this court, to determine. Escobar's testimony was not inherently unbelievable; it did not contradict the laws of nature or other indisputably true evidence. See *Sophie*, 900

F.2d at 1079. The jury was entitled to believe Escobar's testimony, and to base a guilty finding on it.

■ Besides challenging the sufficiency of the evidence to convict him, Mejia challenges several evidentiary rulings by the trial judge. Mejia first contends that the judge erroneously admitted testimony by a DEA agent that the Toronado found in Mejia's garage contained secret compartments. Mejia argues that the testimony about the secret compartments was irrelevant. Evidence is relevant if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R. Evid. 401. Testimony that Mejia possessed a car with secret compartments at the time Escobar arrived at his doorstep was undoubtedly relevant. Vehicles used to transport drugs commonly contain secret compartments in which to hide the drugs; evidence of the secret compartments tended to show the Toronado could be used as a "load car" for drug transactions. The fact that Mejia possessed a load car which could be used to transport any cocaine he received was relevant to show his intent to distribute cocaine. Cf. *United States v. Savinovich*, 845 F.2d 834, 836–37 (9th Cir. 1988) (evidence of possession of scales and guns, common tools of the drug dealing trade, relevant to show intent to distribute). Moreover, the testimony that Mejia possessed a load car tended to show his participation in the conspiracy with Escobar. As the government noted during closing argument, common sense would lead one to wonder why Mejia would happen to have a load car in his garage at the same time a load of cocaine arrived in front of his house, unless he was going to receive and further transport that cocaine.

Mejia also argues that the trial judge should not have admitted the testimony about the secret compartments because the testimony's potential for unfair prejudice substantially outweighed its probative value. See Fed.R.Evid. 403. Testimony that Mejia possessed a load car was certainly prejudicial, but all relevant evidence preju-

dices the party against whom it is introduced. See *Sophie*, 900 F.2d at 1076; *Cook v. Hoppin*, 783 F.2d 684, 689 (7th Cir.1986). Most of the prejudice from the load car testimony comes from its probative value—its tendency to show that Mejia was going to receive cocaine and intended to distribute it. Mejia argues that the testimony about the Toronado also insinuated that Mejia had been involved in past drug transactions, and that the jury might improperly hold that against him. However, the trial judge did not abuse his discretion in concluding that any possibility of unfair prejudice was slight, and that the testimony's probative value outweighed this slight possibility.

■ Mejia next contends that the district court erred in allowing testimony about the details of a trip he took in the Toronado shortly before his arrest. A DEA officer testified that he had observed Mejia drive the Toronado to the south side of Chicago five days before Mejia's arrest. The agent also testified in detail about the stops Mejia made on the trip and about Mejia's activities during those stops. According to Mejia, the agent's testimony was irrelevant.

The fact that Mejia used the Toronado shortly before Escobar arrived with the cocaine was undoubtedly relevant because it tended to show Mejia's use and control of what the jury could conclude was a load car. The fact that Mejia had recently driven the Toronado also tended to refute his contention at trial, established through his son's testimony, that the Toronado was inoperative and that therefore he could not have intended to use it to transport cocaine.

■ While the fact that Mejia used the Toronado was unquestionably relevant, one might reasonably question whether details of Mejia's trip such as his stopping at two gas stations and a restaurant, his meeting with another man, a description of the jacket he was wearing, and a description of the car the other man was driving advanced the government's case against Mejia. But while these details may have been irrelevant, there was no reversible error in admitting them. It is not reversible error to admit irrelevant details that have no proba-

tive value but do not prejudice a defendant. See *United States v. Chaverra–Cardona*, 879 F.2d 1551, 1554 (7th Cir.1989).

Mejia argues that the detailed testimony about his excursion in the Toronado unfairly prejudiced him because it was meant to insinuate that he was conducting a drug transaction on the trip. There are two problems with this argument. The first is that Mejia did not raise this objection in the district court. The proper objection to preserve this issue would have been an objection under Fed.R.Civ.P. 404(b) (prior bad acts) and Fed.R.Civ.P. 403 (unfair prejudice versus probative value). A general objection to "relevance," the objection Mejia made at trial, is not sufficient to preserve an objection under Rules 404(b) or 403. See Fed.R.Evid. 103(a)(1); *United States v. Carroll*, 871 F.2d 689, 691 (7th Cir.1989).

The second problem with this argument is that any insinuation of a drug transaction was very slight. The government adduced no evidence suggesting that Mejia's actions during his trip had anything to do with a drug transaction. Nor did the government argue that the trip involved drugs either in its opening statement or closing argument. Finally, the agent who testified about the trip stated on cross-examination that he did not see Mejia in possession of either drugs or a large sum of money. Absent something in the record showing that it was common knowledge that Mejia's actions took place in an area known for narcotics activity, cf. *United States v. Shelton*, 628 F.2d 54, 56–57 (D.C. Cir.1980), or that Mejia's actions constituted a common method of operation for drug dealers, we think it was unlikely that the evidence about the details of Mejia's trip would have had any effect on the jury.

Mejia raises two other evidentiary points. First, he argues that the district court erred by allowing a DEA agent's testimony that Mejia's house was under surveillance on November 25 because the DEA had received a tip from a confidential informant that a "shipment" was expected to arrive at the house from New York. Mejia argues that the testimony was hearsay, and that no exception to the hearsay rule al-

lows its admission. Mejia, however, has not properly preserved this argument for appeal. The DEA agent testifying about the surveillance of Mejia's house was asked why he was watching the house. The agent answered that he had "previous information." At that point, Mejia's attorney stated, "Objection as to the previous information per se." The court overruled this objection, and the agent went on to testify about the expected "shipment" without further objection.

■ Mejia's objection "per se" stated no recognizable ground for objecting, and thus is not sufficient to preserve any objection for appeal. Fed.R.Evid. 103(a)(1). Rule 103(a)(1) does allow general objections "if the specific ground was . . . apparent from the context." But even if we consider Mejia's objection to be a hearsay objection (hearsay being the ground he now argues), the result remains the same. Hearsay is an out of court statement "offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(a). Evidence about the tip the DEA received was relevant to show something other than the tip's truth. That evidence was relevant to show why the DEA was watching Mejia's home, a fact that in no way depended on the tip's truth. Therefore, the testimony about the tip was not necessarily hearsay. See *United States v. Mancillas*, 580 F.2d 1301, 1309 (7th Cir.1978); *United States v. Freeman*, 816 F.2d 558, 563 (10th Cir.1987). Mejia complains that the judge did not give the jury a limiting instruction concerning this testimony. However, Mejia never asked for a limiting instruction so he cannot complain about the lack of one on appeal. *United States v. Liefer*, 778 F.2d 1236, 1253 (7th Cir.1985).

Even if admissible as non-hearsay, the testimony about the tip would still be subject to Rule 403's balancing test. See *Freeman*, 816 F.2d at 563–64; *Mancillas*, 580 F.2d at 1309–10. Mejia hints at such an argument on appeal, but he does not specifically make it. In any event, Mejia did not raise Rule 403 in his objection in district court, nor was it "apparent" from the context that he was objecting on that basis. Since Mejia never gave the district court the opportunity to balance probative value against prejudice, he has waived the opportunity to complain about that balance on appeal.

Where an evidentiary issue has not been properly preserved for appeal, we still may examine the district court's ruling under the plain error standard. Fed.R.Evid. 103(d); Fed.R.Crim.P. 52(b). A "plain error" is one that results in "an actual miscarriage of justice," which implies that the defendant "probably would have been acquitted but for the erroneously admitted evidence." *Carroll*, 871 F.2d at 692; see also *United States v. Smith*, 869 F.2d 348, 356 (7th Cir.1989). Assuming that it would have been error to admit the testimony about the "shipment" over a proper Rule 403 objection, that error would not be plain error. Although the implication that the agents were expecting a shipment of cocaine (the agent did not specifically testify the "shipment" was cocaine, but it is reasonable to assume the jury could draw that inference) to arrive at Mejia's house might have strengthened Escobar's testimony, there was other evidence to buttress that testimony. For example, as we have noted, in addition to considering Escobar's testimony, the jurors could have reasonably wondered why a load of cocaine would arrive at Mejia's doorstep at the same time he happened to have an operational load car sitting in his garage if Mejia had nothing to do with that cocaine. We cannot conclude that the single reference to a "shipment" was the determining factor in the jury's decision to find Mejia guilty.

■ Mejia's final argument is that the district court erred by admitting evidence that Rex detected the odor of cocaine on the $1,600 agents took from Mejia's home. According to Mejia, this evidence had little probative value and was highly—and unfairly—prejudicial because it intimated that he had possessed cocaine in the past. But, as with the evidence of the tip about the "shipment," Mejia has waived this issue by failing to make a specific objection at trial.

When a DEA agent began to testify about Rex sniffing around the office, Me-

jia's attorney stated, "I'm going to object to this," and asked for a sidebar. The judge stated that he saw no need for a sidebar, and overruled the objection. Mejia argues now that any further objection would have been futile, since the district court had already indicated that he would not have a sidebar. However, Mejia's objection gave the judge no reason to hold a sidebar because the objection failed to state any grounds. Perhaps if Mejia's attorney had briefly stated the grounds for her objection, the judge would have seen the need for further discussion. At oral argument, Mejia's attorney suggested that she did not persist in her objection because she was afraid the judge might show displeasure toward her in front of the jury. But an attorney "has a duty to object, and even at the risk of incurring the displeasure of the trial court, to insist upon his objection." *United States v. Warner*, 855 F.2d 372, 374 (7th Cir.1988) (citations omitted). If counsel was leery of stating her grounds (even if briefly) before the jury, she could have renewed the objection, in a motion to strike, when the jury was absent. Mejia's attorney did not attempt this.

■ If admitting the evidence that Rex detected a cocaine odor on the money was error (and we are not saying it was) it certainly was not plain error. Mejia notes that there was no evidence to tie the money to the cocaine seized in this case, and scant evidence to connect him with the presence of any cocaine odor on the money in any event. Mejia posits that the money could have come into contact with cocaine in any number of ways, including circulation in the general public (the $1,600 was not in brand new bills) and contamination from the agent's desk drawer. We agree that the sniff test was not highly probative, but Mejia's lawyer ably revealed the weakness of this evidence when she cross-examined the agent, and emphasized this weakness during her closing argument. Given this cross-examination and argument, it is not probable that the jury gave this evidence much weight, or, therefore, that the jury would not have convicted Mejia but for this evidence.

For the reasons stated above, we affirm Mejia's conviction.

AFFIRMED.