**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Alphonso MARTINEZ,
Defendant–Appellant.**

**No. 88–2404.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 5, 1990.

Decided July 10, 1991.

---

James M. Conway, Sean B. Martin, David J. Stetler, Asst. U.S. Attys., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Alan Raphael, David Colaric, Chicago, Ill., for defendant-appellant.

Before COFFEY and KANNE, Circuit Judges, and GRANT, Senior District Judge.[*]

COFFEY, Circuit Judge.

Alphonso Martinez appeals his convictions for conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1) and for possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). We affirm.

## I. FACTUAL BACKGROUND

DEA Special Agent Frank Tucci, working undercover, while conducting an investigation of Jose Gonzalez–Semidey ("Gonzalez") purchased one-half, one ounce and two ounces of cocaine on March 11, March 12, and April 29, 1987, respectively, from Gonzalez in the 2800 block of North Richmond Street in Chicago, Illinois. After the purchase of two ounces of cocaine on April 29, Tucci told Gonzalez that he was interested in buying an additional three ounces of cocaine. After this three ounce buy was completed the next day, April 30, Tucci

---

[*] Honorable Robert A. Grant, of the Northern District of Indiana, sitting by designation.

informed Gonzalez of his desire to acquire more cocaine but in pound quantities. Tucci testified, based upon his experience as a DEA Agent, that "by ordering larger quantities I would be able to obtain or find out who [Gonzalez] was obtaining his drugs from."[1] On May 13, 1987, Tucci told Gonzalez that he wished to procure thirty ounces of cocaine. Gonzalez and Tucci met on May 20, 1987 and Gonzalez stated that his source had ten ounces of cocaine available for sale and would get the remaining twenty ounces at a later date. Tucci rejected this approach and, in an attempt to involve Gonzalez' drug source, requested that Gonzalez go to his source immediately and page him (Tucci) when his source was present.

Within an hour Gonzalez paged Tucci, who returned his call. Recognizing Gonzalez' voice, Tucci asked if he had made arrangements for the drug deal to take place on May 26. Gonzalez responded in the affirmative and stated that his drug supply source was in a parking lot across the street from him. As detailed further below, Tucci asked Gonzalez to bring his supplier to the phone, Gonzalez agreed, left the phone to contact his source, and returned several minutes later with a Spanish-speaking man (Martinez speaks Spanish). Gonzalez identified this man as his drug supplier. Meanwhile, surveillance officers observed someone approach a man sitting in a red Chevrolet in the parking lot, saw the red Chevy drive to the alley behind Gonzalez' building, and watched Martinez leave the car and enter the building.

Gonzalez and Tucci confirmed the details of the transaction, in which Tucci would purchase thirty ounces of cocaine in two separate fifteen ounce sales for a total price of $36,000, through telephone conversations on May 26. Gonzalez also informed Tucci during one phone conversation that he would be bringing his "man" (supply source) to the delivery which was set for 2:00 p.m. on May 26. Around 2:00 p.m. on May 26 DEA Agent Furay observed Gonzalez and Martinez enter Martinez' automobile and drive to the same North Richmond Street address where the previous meetings between Gonzalez and Tucci had taken place. Martinez parked his car across the street from Tucci's car and Tucci and Gonzalez met one another in the street. Gonzalez and Tucci walked to Martinez' car and, when Gonzalez opened the door he stated to Tucci "This is my 'man,'" the terminology used to describe his drug source. Following a brief exchange of greetings in English between Tucci and Martinez, Tucci and Gonzalez entered the car. Tucci asked "Where's the dope? Where's the coke?" and Martinez pointed to a plastic shopping bag on the floor of the back seat. Tucci opened the bag and saw approximately fifteen ounces of cocaine. Tucci said he would pay the high price ($36,000) Gonzalez and Martinez were charging if the drug's quality was good. Gonzalez and Martinez spoke with one another in Spanish before Martinez responded "It's good." When Tucci left the car for the ostensible purpose of obtaining the money to purchase the cocaine, he gave a pre-arranged signal for the arrest of Gonzalez and Martinez.

Martinez was charged, tried before a jury and convicted of one count of conspiracy to distribute cocaine under 21 U.S.C. § 846 and one count of possession of cocaine with intent to distribute under 21 U.S.C. § 841(a)(1).[2] On the possession with intent to distribute conviction Martinez was sentenced to five years imprisonment and a special parole term of five years. On the conspiracy conviction, imposition of sentence was suspended and Martinez was placed on five years probation, with the probation period to run consecutive to the

---

**1.** Tucci went on to explain that: "It was my experience in the past, if I ordered larger and larger quantities, eventually the person who owns a larger amount of drugs will come himself to see what's going on or to run the deal, or to protect his investment."

**2.** The indictment charged Gonzalez with the same two counts as Martinez. In addition, the indictment charged Gonzalez with four counts of distribution of cocaine in violation of 21 U.S.C. § 841(a)(1). The government disclosed to the court in the absence of the jury that Gonzalez had entered a guilty plea prior to Martinez' trial.

sentence on the possession with intent to distribute count.

## II. ISSUES PRESENTED

On appeal we are presented with the following issues: (1) Was the evidence sufficient for the jury to find Martinez guilty of conspiracy to distribute cocaine and of possession of cocaine with intent to distribute; (2) Did the trial court commit plain error in admitting testimony of DEA agents concerning the content of radio messages received from Agent Tucci; (3) Did the district court commit plain error in permitting the prosecutor, during closing argument, to refer to certain facts as "undisputed?"

## III. SUFFICIENCY OF THE EVIDENCE

Martinez contends that the evidence was insufficient to support the jury's verdicts finding him guilty of conspiracy to distribute cocaine and possession of cocaine with intent to distribute. Our standard for reviewing challenges to sufficiency of the evidence has been summarized as follows:

> " 'In evaluating [Haro's] sufficiency of the evidence challenge, we note that [he] bears a heavy burden. Initially, we "review all the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government." ' *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir. 1988) (quoting *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir.1984)) [*cert. denied*, 474 U.S. 1085, 106 S.Ct. 860, 88 L.Ed.2d 899 (1989)]. 'The test is whether after viewing the evidence in the light most favorable to the government, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' *Pritchard*, 745 F.2d at 1122 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original))."

*United States v. Herrero*, 893 F.2d 1512, 1531 (7th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 2623, 110 L.Ed.2d 644 (1990). As

we observed in *United States v. Caudill*, 915 F.2d 294, 297 (7th Cir.1990):

> "A verdict will withstand a sufficiency of the evidence challenge unless there is no evidence from which the jury could find guilt beyond a reasonable doubt. *See United States v. Beverly*, 913 F.2d 337, 360 (7th Cir.1990) [*cert. denied*, — U.S. —, 111 S.Ct. 766, 112 L.Ed.2d 786, *cert. granted, Griffin v. United States*, — U.S. —, 111 S.Ct. 951, 112 L.Ed.2d 1039 (1991)]; *United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir.1990). In appeals of jury trials such as this case, we are obliged to ' "defer to reasonable inferences drawn by the jury and the weight it gave to the evidence. Likewise, we leave the credibility of witnesses solely to the jury's evaluation, absent extraordinary circumstances." ' *Beverly*, at 360 (quoting *United States v. Hogan*, 886 F.2d 1497, 1502 (7th Cir.1989) (citation omitted))."

### A. *Conspiracy to Distribute Cocaine*

■ " 'A conspiracy is a "combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." ' *United States v. Herrera*, 757 F.2d 144, 149 (7th Cir.1985) (quoting *United States v. Mayo*, 721 F.2d 1084, 1088 (7th Cir.1983)). 'Thus, the "essential elements of a conspiracy under § 846 [of the Controlled Substance Act] are the existence of an agreement between two or more individuals, with the intent to commit an offense in violation of the Controlled Substance Act." ' *Nesbitt*, 852 F.2d at 1510 (quoting *United States v. Sweeney*, 688 F.2d 1131, 1140 (7th Cir.1982))."

*United States v. Diaz*, 876 F.2d 1344, 1351 (7th Cir.1989). As we noted in *Caudill*, 915 F.2d at 297:

> "To sustain the conspiracy charge against [the defendant], the government need only prove the existence of the conspiracy and a participatory link with the defendant[]. [*United States v.*] *Durrive*, 902 F.2d [1221, 1225 (7th Cir.1990)]; *United States v. Missick*, 875 F.2d 1294, 1297 (7th Cir.1989). Substantial evidence must support both the existence of the

conspiracy and the defendant['s] participation in it. *Durrive*, 902 F.2d at 1229. Nonetheless, we 'view the evidence in the light most favorable to the government and accept circumstantial evidence as support, even sole support, for a conviction.' *Id.*"

Thus, while much of the evidence against Martinez was circumstantial, that factor fails to support his claim of insufficiency of evidence to uphold his conviction. In *United States v. Briscoe*, 896 F.2d 1476, 1505–06 (7th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990), a case involving the use of circumstantial evidence in support of a conspiracy conviction, we elucidated the important role circumstantial evidence can play in demonstrating the existence of a conspiracy and a defendant's participation in the conspiracy:

"In establishing the existence of an overall conspiratorial agreement, as well as a particular defendant's participation therein, we note that it is perfectly legitimate for the government to offer and for the jury to consider circumstantial evidence. *United States v. Vega*, 860 F.2d 779, 793 (7th Cir.1988). 'By its very nature, a conspiracy "is conceived and carried out clandestinely, and direct evidence of the crime is rarely available." ' *United States v. Mayo*, 721 F.2d 1084, 1088 (7th Cir.1983) (quoting *United States v. Washington*, 586 F.2d 1147, 1153 (7th Cir.1978)). Thus, '[n]ot only is the use of circumstantial evidence permissible, but circumstantial evidence may be the *sole support* for a conviction.' *United States v. Reed*, 875 F.2d 107, 111 (7th Cir.1989) (quoting *Vega*, 860 F.2d at 793–94) (emphasis in original and citations omitted). Although the jury's verdict may not rest 'solely on the piling of inference upon inference …, [t]he view that the prosecution's case must answer *all* questions and remove *all* doubts … of course, is not the law because that

would be impossible; the proof need only satisfy reasonable doubt.' *Nesbitt*, 852 F.2d at 1511 (emphasis in original and citations omitted). Indeed, '[j]uries are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict … While "[c]ommon sense is no substitute for evidence, … common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence." ' *Id.* (citations omitted)."

*United States v. Briscoe*, 896 F.2d at 1505–06.

■ Dealing with the question of Martinez' participation in the conspiracy to distribute cocaine, we note that the jury was presented with evidence of several relevant events that transpired on May 20, 1987. In a telephone call with Tucci on that date Gonzalez stated that his drug source was parked across the street and Gonzalez agreed to Tucci's request to bring his supplier to the phone.[3] After Tucci radioed DEA surveillance officers notifying them that Gonzalez was going to meet his source, one surveillance officer observed a male leave Gonzalez' building while another officer observed another man walk to a red Chevrolet in the parking lot across the street from the building where Gonzalez was located and speak with the person seated in the red Chevrolet.[4] The officers further observed the red Chevrolet leaving the parking lot and entering the alley directly behind Gonzalez' building. Special Agent Furay of the DEA observed a man he identified as Martinez exit the red Chevrolet and enter the building. Gonzalez returned to the telephone a few minutes after Tucci had directed him to summon his drug source and advised Tucci that his source was present with him at the phone. During the conversation between Tucci and Gonzalez, Tucci asked if the drug deal could take place on May 26 and overheard an exchange in Spanish (presumably be-

---

**3.** Tucci testified that he recognized the voice of the other party to the conversation as that of Gonzalez.

**4.** Although the surveillance officer who observed the conversation never identified either

of the two males who were parties to the encounter, it should be noted that Martinez was identified as the individual who exited the red Chevrolet and entered Gonzalez' building a short time later.

tween Gonzalez and the drug source) prior to Gonzalez' statement that the drug deal would take place on May 26. Based upon this series of events, in conjunction with subsequent events such as Gonzalez' statement at the May 26, 1987 buy that Martinez was his drug source, a jury could reasonably infer that Gonzalez and his drug source came to an agreement during the May 20, 1987 telephone call to distribute cocaine to Tucci on May 26, 1987, and that Martinez was the drug source.

The identity of Martinez as the person who agreed with Gonzalez to distribute cocaine to Tucci was substantiated in the events that took place on May 26, 1987. Prior to the time of the planned drug sale, surveillance agents observed Martinez enter the building where Gonzalez was located. Tucci testified that during a subsequent telephone call Gonzalez told him that his drug source was with him and that his drug source would accompany him to the buy. Later, Martinez participated in the drug transaction that took place in the automobile Martinez drove, thus substantiating the conclusion that Martinez was the drug source whom Gonzalez had previously stated would be with him. Further confirmation of Martinez' role as Gonzalez' drug source is found in succeeding events. As Tucci was about to enter Martinez' automobile to complete the drug transaction, Gonzalez, referring to Martinez, told Tucci, "This is my 'man,'" or drug source and, as the drug deal was unfolding, Martinez continued to play a very active role, pointing to the drug on the floor of the car's back seat in response to Tucci's inquiry and, following consultation with co-conspirator Gonzalez, providing Tucci with assurances of the cocaine's quality. Thus, the events of May 20 and 26, 1987, provide sufficient evidence, in our opinion, to allow a reasonable jury to conclude that Martinez had knowingly entered into a conspiracy with Gonzalez to distribute cocaine.

## B. *Possession of Cocaine with Intent to Distribute*

■ Martinez goes on to argue that the evidence was insufficient to support his conviction for possession of cocaine with intent to distribute. "In order to demonstrate possession of cocaine, it is sufficient that the government show a level of control that meets the standard of 'constructive possession.'" *United States v. Grier*, 866 F.2d 908, 930 (7th Cir.1989). As we observed in *United States v. Moya–Gomez*, 860 F.2d 706, 756 (7th Cir.1988), *cert. denied*, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989):

> "The rule of constructive possession holds that 'a person can be convicted for possessing cocaine although he does not possess it in a literal sense.' *United States v. Manzella*, 791 F.2d 1263, 1266 (7th Cir.1986). 'To establish constructive possession of a controlled substance, the government must produce evidence demonstrating "ownership, dominion, or control over the contraband...."' *United States v. Galiffa*, 734 F.2d 306, 316 (7th Cir.1984) (quoting *United States v. Ferg*, 504 F.2d 914, 916–17 (5th Cir.1974))...."

As we explained in *United States v. Molinaro*, 877 F.2d 1341, 1348 (7th Cir.1989):

> "To prove constructive possession in narcotics cases, the government must show that the defendant had *the ability to exercise control over the narcotics, that is, the power to possess them*. Evidence which establishes that the defendant is one of a group of conspirators who jointly control the narcotics is sufficient to prove constructive possession."

(Citations omitted, emphasis added).

■ The evidence presented to the jury established that on the afternoon of May 26, 1987, fifteen grams of the cocaine that Gonzalez and Martinez had agreed to sell to Agent Tucci were on the floor of the back seat of the red Chevy that Martinez drove. Martinez was aware of the presence of the cocaine in the vehicle, as he directed Tucci's attention to the drug's location when Tucci asked where it was, and he also answered Tucci's question concerning the quality of the cocaine. This demonstrated that Martinez had knowledge of and "the ability to exercise control over" or "the power to possess" the drugs in his car. Martinez' control over the cocaine was further evinced in Gonzalez' frequent

references to Martinez as his "man" or cocaine source.[5] Thus, a jury could very easily conclude that Martinez knowingly exercised joint control and dominion with co-conspirator Gonzalez over the cocaine present in Martinez' automobile and that he intended to carry out his agreement to sell and distribute the cocaine promised to Agent Tucci.

## IV. CHALLENGES TO ADMISSION OF RADIO COMMUNICATIONS REFERRING TO THE LOCATION OF GONZALEZ' "SOURCE OF SUPPLY" UNDER RULES 401 AND 403

The trial judge received in evidence testimony from DEA Agent Furay that on May 20, 1987, Tucci radioed surveillance officers that "Gonzalez' source of supply would be arriving in that area in a parking lot very shortly...." The court also admitted testimony from Chicago Police surveillance Officer D'Andrea that on May 20th he received "a radio communication from Agent Tucci that the source of supply for Gonzalez was parked in a parking lot...." The parking lot referred to was the parking lot of a Walgreen's drug store across the street from Gonzalez' building. The trial court admitted these statements for the purpose of explaining the state of mind and activity of the officers subsequent to the receipt of the communications rather than for the truth of the matters asserted in the messages.[6]

In this case the two statements were allegedly relevant to indicate the commencement of the surveillance activities that Furay and D'Andrea conducted after they received the radio message. As the record reflects, after he received his radio communication, D'Andrea observed an unidentified man seated in a red Chevrolet speak with another person who was standing outside the automobile, while Furay, after hearing his communication, observed a man he identified in court as Martinez exit the red Chevrolet and enter Gonzalez' building. Martinez argues that these statements were irrelevant and should have been excluded under Rule 401. Further, in an objection he failed to raise at trial, Martinez argues that even if the statements were relevant, they should have been excluded under Rule 403 of the Federal Rules of Evidence because their prejudicial reference to Gonzalez' source of supply outweighed their probative value.

---

**5.** Tucci clearly understood Martinez' reference to his "man" to be a reference to his drug source. For example, in discussing his May 20 conversation with Gonzalez he stated that Gonzalez "said that his source had—or his 'man,' his source had ten ounces available at that time which he would sell me immediately and the remaining twenty ounces would be the following day." Those involved in drug transactions frequently use veiled language or code words. As we noted in *United States v. Vega,* 860 F.2d 779, 795 (7th Cir.1988):

"The fact that tapes of the conversations implicating Vega in the drug conspiracy may, in certain parts, have been somewhat unclear, does not preclude a determination that he participated in the conspiracy. As we observed in *United States v. Zanin,* 831 F.2d 740, 744 (7th Cir.1987): 'Conversations regarding drug transactions are rarely clear. A factfinder must always draw inferences from veiled allusions and code words.' In this case the jury was confronted with conversations which contained 'code words' that, when considered in isolation, might seem unclear, veiled and almost nonsensical, but when analyzed properly, in the context of the totality of the evidence, can clearly be seen to be 'code words' for drugs."

Obviously Gonzalez' use of the word "man" was a loosely "veiled allusion" to his drug source.

**6.** After D'Andrea's statement the trial judge instructed the jury:

"Perhaps I ought to explain to the jury. A couple times or several times yesterday I permitted testimony about conversations which were made outside of court and which would be hearsay if offered to prove exactly what was intended by the person who made the statement. I accepted them for the limited purpose not to prove that the truth of what was said *but the fact that it was said to this particular witness or that witness yesterday and to justify or to explain their state of mind or their actions which were taken as the result of those conversations. So, it is a limited purpose.*"

(Emphasis added). The court went on to state to the jury: "Let me just make one further explanation. *This does not prove that a source of supply for Mr. Gonzalez was in fact proved there.* It was something that was said that this witness heard and presumably he will have made some actions as a result of that conversation." (Emphasis added).

## A. *Rule 401 Objection to Relevance*

■ With respect to the relevance objection, Martinez "carries a heavy burden on appeal because an evidentiary ruling will be reversed only if a trial court committed '*a clear abuse of discretion.*'" *Jones v. Hamelman*, 869 F.2d 1023, 1027 (7th Cir.1989) (quoting *Bohannon v. Pegelow*, 652 F.2d 729, 732 (7th Cir.1981)) (emphasis added in *Jones*). We have recognized the relevance of statements which explain the conduct of law enforcement agents conducting an investigation. *See United States v. Mejia*, 909 F.2d 242, 247 (7th Cir.1990) ("Evidence about the tip the DEA received was relevant to show something other than the tip's truth. That evidence was relevant to show why the DEA was watching Mejia's home, a fact that in no way depended on the tip's truth."). *See also United States v. Lazcano*, 881 F.2d 402, 407 (7th Cir.1989) ("An examination of the record makes clear that Ortega's testimony regarding the Colombian man's statement that the defendant 'was from the Herreras from Durango,' ... was not offered to prove that Mr. Lazcano was indeed a member of the Herrera family, but rather to set the context in which the DEA investigation originated."); *United States v. Mancillas*, 580 F.2d 1301, 1309 (7th Cir.) ("A statement that is relevant, *see* Rule 401, merely because it was made, and that is not unduly prejudicial, *see* Rule 403, may be admitted even though the declarant cannot be cross-examined. Whether or not the Rodriguez statement was true, the fact that it was made would surely explain the flurry of investigative activity in three states that the jury was soon to hear about."), *cert. denied*, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). Thus, we are of the opinion that the trial court's exercise of discretion was proper in holding that the contested statements were relevant since they merely serve to explain why the officers were observing Martinez.

## B. *Rule 403 Prejudice Claim*

■ As noted above, Martinez failed to raise his Rule 403 objection in the trial court. "Since [Martinez] never gave the district court the opportunity to balance probative value against prejudice, he has waived the opportunity to complain about that balance on appeal." *Mejia*, 909 F.2d at 247. "Where an evidentiary issue has not been properly preserved for appeal, we still may examine the district court's ruling under the plain error standard." *Id.* In *United States v. White*, 903 F.2d 457, 466–67 (7th Cir.1990), we explained the "plain error" standard as follows:

> "As we observed in *United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir. 1984): 'To be plain, an error must be conspicuous, at least in hindsight....' As we have also noted:
>
>> 'A plain error is an error that is "not only palpably wrong but [is] also likely to cause the outcome of the trial to be mistaken." *United States v. Kehm*, 799 F.2d 354, 363 (7th Cir.1986). "A reversal on the basis of plain error can be justified 'only when the reviewing court is convinced that it is necessary in order to avert an actual miscarriage of justice.'" [*United States v. Requarth*, 847 F.2d 1249, 1254 (7th Cir. 1988)] (quoting *United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir. 1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985)).'
>
> *United States v. Dietrich*, 854 F.2d 1056, 1060 (7th Cir.1988)."

"The plain error doctrine allows an appellate court to correct errors that were not objected to at trial if the defendant can demonstrate that he or she probably would have been acquitted but for the erroneously admitted evidence." *United States v. Wynn*, 845 F.2d 1439, 1443 (7th Cir.1988).

■ Even if we were to conclude that the challenged statements were erroneously admitted under Rule 403, which we do not, the "plain error" standard would require proof that Martinez would probably have been acquitted in the absence of the alleged error. As detailed in our discussion of sufficiency of the evidence in Section III, *supra*, Martinez' participation in a conspiracy to distribute cocaine and his possession of cocaine with intent to distribute were clearly established in the record. The events of May 20 and May 26, apart

from the radio communication concerning Gonzalez' source of supply, permitted the jury to infer that Martinez was Gonzalez' source. Additionally, Martinez' constructive possession of the cocaine intended to be delivered to Tucci, set forth in Section III–B, *supra,* provided a basis for his conviction for possession of cocaine with intent to distribute. In light of the substantial evidence of Martinez' guilt of conspiracy to distribute cocaine and of possession of cocaine with intent to distribute, we are convinced that the admission of the testimony regarding the contents of the radio communications incidentally describing an individual later identified as Martinez as Gonzalez' source of supply was far from being "the determining factor in the jury's decision to find [Martinez] guilty," *Mejia,* 909 F.2d at 247. Thus, the evidence fails to meet that standard of "plain error" necessary for us to reverse Martinez' convictions.

## V. ALLEGED COMMENTS ON FAILURE TO TESTIFY

■■■ Martinez argues that during his closing argument the prosecutor made references to "undisputed" evidence that indirectly called attention to his failure to testify, and, thus, violated his Fifth Amendment privilege against self-incrimination.[7] Because Martinez did not object to these statements in the trial court, we review only under the plain error standard. *See United States v. Sblendorio,* 830 F.2d 1382, 1396 (7th Cir.1987) ("[W]hen the defendants do not object to the improper portions of a closing argument, only error both 'plain' and 'harmful' supports a new trial."), *cert. denied,* 484 U.S. 1068, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988).

In *United States ex rel. Lee v. Flannigan,* 884 F.2d 945, 954 (7th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 3277, 111 L.Ed.2d 3277 (1990), we observed:

"The fifth amendment forbids the prosecution to comment on a defendant's failure to testify. A prosecutor's direct reference to a defendant's failure to take the stand is clearly a violation of the Fifth Amendment. An indirect reference, however, is a violation only if 'the language appears "manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." ' *United States v. DiCaro,* 852 F.2d 259, 263 (7th Cir.1988) (quoting *United States v. Lyon,* 397 F.2d 505, 509 (7th Cir.), *cert. denied,* 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968))...."

(Citations omitted). "This Court has not yet established a *per se* rule construing as improper any prosecutorial reference to testimony as undisputed where the defendant does not testify." *Lindgren v. Lane,* 925 F.2d 198, 204 (7th Cir.1991). As we noted in *United States v. Hernandez,* 865 F.2d 925, 929 (7th Cir.1989): "[A] prosecutor's comment that the evidence is uncontradicted does not implicate [the Fifth Amendment] right, unless the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify." *Accord, United States ex rel. Adkins v. Greer,* 791 F.2d 590, 597 (7th Cir.), *cert. denied,* 479 U.S. 989, 107 S.Ct. 584, 93 L.Ed.2d 586 (1986). "Comments about a defendant's failure to testify do not necessarily mandate reversal of the conviction; the issue is whether the error was harmless beyond a reasonable doubt." *United States v. Perez,* 870 F.2d 1222, 1229 (7th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 136, 107 L.Ed.2d 95 (1989).

■■■ Two of the prosecutor's statements that Martinez alleges were improper concerned Martinez' presence at particular locations.[8] The question of whether Mar-

---

7. The allegedly improper prosecutorial statements are reproduced in footnotes 8, 9 and 10, *infra,* and the accompanying text.

8. One statement, made during the opening part of the prosecutor's closing argument, was:
"Now, why am I stressing the fact that they were not carrying anything and why did I ask

those questions? I believe it is extremely significant because Mr. Martinez and Mr. Gonzalez left that address at 3119 Kimball and went directly to Richmond and George Streets, not making any stops. Now, that evidence is absolutely undisputed."

tinez could be found at certain places at given times is unlikely to have been known only to Martinez. As we noted in reference to a similar argument in *United States v. DiCaro*, 852 F.2d 259, 263 (7th Cir.1988): "DiCaro's whereabouts were not something highly likely to be known only to DiCaro." Furthermore, "[w]e have never held that references to uncontroverted evidence which could have been controverted by someone other than the defendant will constitute reversible error." *Kurina v. Thieret*, 853 F.2d 1409, 1416 (7th Cir.1988), *cert. denied*, 489 U.S. 1085, 109 S.Ct. 1544, 103 L.Ed.2d 848 (1989). *See also DiCaro*, 852 F.2d at 263 ("A prosecutor's assertion that evidence is uncontradicted is impermissible only if it is highly unlikely that anyone other than the defendant could rebut the evidence."). Because the jury would *not have* "naturally and necessarily" understood the two statements concerning Martinez' location to "comment on the defendant's failure to testify," *United States ex rel. Burke v. Greer*, 756 F.2d 1295, 1300 (7th Cir.1985), we hold that the declarations did not violate Martinez' Fifth Amendment rights.

 The prosecutor also made statements concerning whether the evidence relevant to certain other elements of the case was undisputed. In his opening argument the government's attorney asserted that "[i]t is undisputed that [Martinez] had an agreement with Mr. Gonzalez."[9] With respect to the possession with intent to distribute charge, at the end of the prosecutor's lengthy explanation of the concept of constructive possession and its application

to this case during rebuttal closing argument, he concluded: "Mr. Martinez was in direct possession—excuse me—constructive possession of the cocaine that was in his rear seat. There is really no evidence to the contrary."

Neither of these declarations concern matters about which the jury would expect Martinez to possess sole knowledge and thus be the only person who could have controverted the evidence. Indeed, the conspiratorial agreement between Martinez and Gonzalez was established through a broad array of circumstantial and direct evidence. As set forth in Section III, *supra*, it was permissible for the jury to infer from the events of May 20 that Martinez was present with Gonzalez when Gonzalez informed Tucci telephonically that he was with his "source." Later on May 26, when the cocaine deal was scheduled to take place, Martinez entered Gonzalez' building several hours prior to the sale. During a telephone conversation that took place after Martinez' entry, Gonzalez again told Tucci that his drug source was with him and that *"they* had the cocaine and *they* were ready to go." Martinez and Gonzalez were both present at the time of the drug sale when Gonzalez told Tucci that Martinez was his "man" (drug source). At the same time, Martinez responded to the agent's inquiries concerning the drug's quality and location in the vehicle. The defendant, in an attempt to establish that the inference that Martinez was present during the telephone conversation of May 20 was incorrect, thoroughly cross-examined the government's witnesses to no

---

The other declaration, made in the government's rebuttal closing argument, was:
"The evidence as to Mr. Martinez parking his 1980 red Chevrolet behind the residence at 3119 Kimball and entering that particalr (sic) residence and leaving that particular residence is undisputed."

9. In full context, the prosecutor's statement was:
"Basically, the first charge charges a conspiracy between Mr. Gonzalez and Mr. Martinez. That conspiracy started on March 11th, 1987 until May 26th, 1987. Now you have to use your good judgment in determining when that conspiracy actually started. Did it start on May 13th, did it start on May 20th or did it start on March 11th, 1987? Well, Judge Lein-

enweber is going to give you an instruction that when the words 'on or about' are used, that means that anywhere in that time period, or words to that effect. Basically, what it means is that 'on or about' means somewhere in that area. If it was March, May or April, that really doesn't matter to determine when the conspiracy started. It is more important to determine whether or not Mr. Martinez was a member of that conspiracy. Did he have some type of agreement between Mr. Gonzalez to deliver narcotics? Clearly he did. There is absolutely no evidence to the contrary. It is undisputed that he had an agreement with Mr. Gonzalez."

avail. Further, if the defendant had other testimony to overcome the inference of his presence on May 20, he should had presented it to the jury. Obviously he had no other witnesses and the jury accepted the testimony of the government witnesses as credible. Because Martinez' presence during the May 26 drug sale was related to the transaction, the defendant did very little cross-examining of government witnesses in his futile attempt to rebut the constructive possession inference obviously because Martinez was unable to establish any legitimate purpose for his association with Gonzalez. This defense also went for naught. Furthermore, since Gonzalez was not being tried with Martinez, the jury could have expected Martinez to present Gonzalez as an exonerating witness if Martinez was innocent. Thus, the jury would not "naturally and necessarily" have considered a statement regarding the "undisputed" nature of the evidence on the conspiracy or the constructive possession question to reflect an indirect comment on Martinez' failure to testify.

The evidence relevant to the possession conviction primarily concerned a drug transaction that took place in Martinez' automobile at which Martinez, Gonzalez and Agent Tucci were present. When this transaction began Gonzalez told Tucci, in reference to Martinez, that, "This is my 'man,'" or direct source. Martinez and Gonzalez were each eye-witnesses to the transaction. Both Martinez and Gonzalez could have provided testimony to refute Agent Tucci's version of the transaction. Thus, the government's references to "undisputed" evidence did not call the jury's attention to matters concerning which only Martinez could testify. Because Martinez was not the only person who could have provided testimony relevant to the possession issue, it clearly follows that the jury would not have "naturally and necessarily" viewed a prosecutor's statement concerning undisputed evidence on the possession issue to have been an improper indirect comment upon Martinez' failure to testify.

■■■ Martinez also challenges several of the prosecutor's general comments concerning the fact that evidence was "undisputed." [10] In *United States ex rel. Adkins v. Greer*, 791 F.2d 590, 598 (7th Cir.), *cert. denied*, 479 U.S. 989, 107 S.Ct. 584, 93 L.Ed.2d 586 (1986), we considered the permissibility of a "prosecutor's statement that 'The state's evidence is the only evidence in the case,' and a rhetorical question, 'Ladies and Gentlemen, if that wasn't the case, why say we rest?'" We held: "We do not believe that these general statements 'naturally and necessarily' remind the jury that [the defendant] did not testify." *Id.* Similarly, in *United States v. Dahdah*, 864 F.2d 55, 59 (7th Cir.1988), *cert. denied*, 489 U.S. 1087, 109 S.Ct. 1550, 103 L.Ed.2d 853 (1989), we observed: "[T]he prosecutor's comment that 'the evidence in this case is overwhelming, that is why it is not surprising that the defendant took the stand yesterday and got up there and told you she did not know' was nothing

---

**10.** The government's attorney concluded the opening portion of his closing argument with the following statement:

"Now, the evidence in this case is absolutely undisputed. That is all you can really go on is, what came from the witnesses' mouths and the evidence that has been submitted in the way of exhibits and the stipulations, of course, that were read. You might remember that the substance in government's Exhibit Lab No. 1 was cocaine. There is no question about that. It has a 58% purity level, the Schedule II narcotics controlled substance. So, really, the evidence in this case is undisputed. We submit that the only evidence that is before you is that Mr. Martinez is guilty of both the charges that his has been named in."

In his rebuttal argument the prosecutor made the following statements concerning the weight of the circumstantial evidence presented to the jury:

"Jduge [sic] Leinenweber is going to tell you that the direct evidence and circumstantial evidence have exactly the same value as a matter of law; that exactly the same weight is to be given circumstantial evidence as it is to direct evidence. That is what this case is all about, a lot of things adding up to one logical conclusion. It's undisputed evidence, ladies and gentlemen, never contradicted."

Finally, as part of the conclusion of his rebuttal argument, the prosecutor stated:

"Ladies and gentlemen, the facts that have been presented to you constitute the evidence in this case. The only evidence in this case that is before you is that Mr. Martinez has violated two separate distinct felonies, two separate and distinct narcotics laws."

more than a general comment on the implausibility of Dahdah's defense—a reasonable inference based on the evidence." Likewise, we are convinced that the prosecutor's general descriptions of the evidence against Martinez as "undisputed," "never contradicted," or "the only evidence in this case" did not naturally and necessarily call the jury's attention to Martinez' failure to testify. Rather these statements constituted acceptable characterizations of the evidence in the case, including many matters which could be disputed by persons other than Martinez. The statements were not improper and we refuse to make them so by court edict.

Even if any of the prosecutor's declarations were improper, Martinez failed to object to them in the trial court. "In the absence of a proper objection, the court's ruling may only be reversed if a 'plain error' was committed." *United States v. White*, 903 F.2d 457, 466 (7th Cir.1990). As we noted above, the defendant must "demonstrate that he or she probably would have been acquitted but for the [error]." *Wynn*, 845 F.2d at 1443. As outlined in our discussion of the application of the plain error doctrine to the trial court's admission of evidence under Rule 403 in Section IV, *supra*, the evidence of Martinez' guilt of both the conspiracy and possession with intent to distribute counts was clearly overwhelming. Furthermore, as discussed above, the prosecutor's references to "undisputed" evidence were permissible and certainly cannot be inferred to be a comment on a failure to testify. Thus, from our review of the record we are convinced that Martinez is unable to demonstrate that he probably would have been acquitted but for the statements the prosecutor made during closing argument and hold that the district court did not commit plain error in permitting these statements to be made.

We hold that sufficient evidence supports the jury's guilty verdicts and conviction on both counts and further that the trial court

did not commit reversible error. Martinez' convictions are

AFFIRMED.