**UNITED STATES of America, Plaintiff–Appellee,**

v.

**William P. VAN DAAL WYK, Defendant–Appellant.**

**No. 86–1951.**

United States Court of Appeals, Seventh Circuit.

Argued May 19, 1987.

Decided Feb. 19, 1988.

Thomas A. Else, Jr., Hieber Else & Assoc., Chicago, Ill., for defendant-appellant.

Eric J. Klumb, Asst. U.S. Atty., Joseph P. Stadtmueller, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before WOOD and CUDAHY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

Out-of-court statements made by fellow conspirators of a criminal defendant are, under Federal Rule of Evidence 801(d)(2)(E), deemed not to be hearsay if made during the course and in furtherance of the conspiracy. William P. Van Daal Wyk was convicted of possession of cocaine with intent to distribute and conspiracy to possess cocaine with intent to distribute. 21 U.S.C. §§ 841(a)(1), 846. He contends that the court below erred in finding that statements offered against him at trial fit under 801(d)(2)(E). He contends that the court erred both in finding on the basis of evidence independent of hearsay that he participated in the conspiracy and in finding that certain statements were made in furtherance of the conspiracy. We will affirm.

I

William P. Van Daal Wyk was charged with eight other defendants in a thirty-six count indictment. Van Daal Wyk was charged in two counts: count one, conspiracy to possess cocaine with intent to distribute, and count fifteen, possession of cocaine with intent to distribute. He was tried separately, convicted on both counts, and sentenced to two concurrent twenty-year terms of imprisonment.

The principal issue in this case is whether the trial court erred in admitting coconspirator hearsay statements. Under Fed. R.Evid. 801(d)(2), "A statement is not hearsay if—... The statement is offered

against a party and is ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Rule 801 thus removes certain coconspirator statements from the domain of Rule 802, which provides that hearsay is inadmissible unless it falls into one of the many exceptions.

For out-of-court statements to be admissible under Fed.R.Evid. 801(d)(2)(E), we have held that the government must prove by a preponderance of competent evidence independent[1] of the statements (1) that the conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the statements were made during the course of and in furtherance of the conspiracy. *See, e.g., United States v. Kaden,* 819 F.2d 813, 819 (7th Cir.1987); *United States v. Boucher,* 796 F.2d 972, 974 (7th Cir.1986). *United States v. Santiago,* 582 F.2d 1128, 1135 (7th Cir.1978). The showing may be made on the basis of circumstantial evidence. *Kaden,* 819 F.2d at 819 (*citing United States v. Dalzotto,* 603 F.2d 642, 645 (7th Cir.), *cert. denied,* 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425 (1979)). We disturb the district court's finding that these requirements are met only if it is clearly erroneous. *United States v. Shoffner,* 826 F.2d 619, 627 (7th Cir.1987); *Kaden,* 819 F.2d at 819.

The trial court in this case followed a procedure that we have long sanctioned. The court permitted the government to introduce at trial evidence of the statements on the basis of an offer of proof, subject to the condition that at the close of the government's case the defendant could move for a mistrial or for evidence of the statements to be struck. See *Santiago,* 582 F.2d at 1131; *United States v. Frasch,* 818 F.2d 631, 635 (7th Cir.1987). Van Daal Wyk made such a motion, which the trial court denied.

The government made the following showing at trial: James T. Brill ran a thriving cocaine wholesale distribution business based in Oshkosh, Wisconsin. Russell Buckner testified at trial about the operation. Buckner's chief job was that of courier between Brill and Brill's supplier. He delivered cocaine and money to and from Oshkosh for Brill, visiting such places as Chicago, Milwaukee, California, and Madison. He carried money in amounts up to $525,000 and cocaine in masses up to twenty kilograms.

From December of 1983 to August of 1984, the garbage at Brill's apartment was picked up not by sanitary workers but by Thomas Larson, a Special Agent of the Internal Revenue Service. Larson found ledgers used to record business transactions. He also found many handwritten notes. The tokens "lb" to "g" appear frequently in these notes: pounds and grams are units of measure frequently used in drug transactions. There were also notations containing the name "Bill" next to various numbers; the defense did adduce evidence that Brill dealt with others in the narcotics business named "Bill." Van Daal Wyk appeared in photographs found in Brill's garbage and others found later in his home. Shortly before Brill moved from the apartment, Larson found in the garbage a note to Brill informing him that federal agents were picking up his garbage. Larson continued to inspect Brill's garbage at his new address.

James Davolis, a cocaine dealer, testified to buying cocaine from Brill and from Van Daal Wyk. Davolis regularly bought quarter and half pounds of cocaine from Brill until the end of 1984. Twice when Davolis was unable to reach Brill he bought an ounce of cocaine from Van Daal Wyk. Davolis had met Van Daal Wyk after joining a darts team that had Brill and Van Daal Wyk as members. Davolis ceased selling

---

1. Subsequent to oral argument in this case, *Bourjaily v. United States,* —— U.S. ——, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), held that the court, in determining whether the 801(d)(2)(E) requirements are met, is not limited to independent evidence of the conspiracy and of the defendant's participation in it: the court may also consider the coconspirator statements themselves. Because we hold that the trial court did not err in finding the requirements met under the more stringent pre-*Bourjaily* standards that then governed under the law of this circuit, there is no call for us to consider the effect of *Bourjaily* on this case.

cocaine in mid–1985. He referred his customers to Van Daal Wyk for an agreed-upon commission.

Leon Luker testified that after he asked Brill where he could obtain cocaine, Brill responded that although he had none in his home, he would have "Bill" contact him that evening. Van Daal Wyk went to Luker's home that evening and sold Luker a quarter or half ounce of cocaine. Luker subsequently bought similar quantities of cocaine from Van Daal Wyk at least nine times. The first two transactions were cash on delivery: after that, Van Daal Wyk "fronted" the cocaine to Luker, meaning that Luker would pay the purchase price on Van Daal Wyk's next visit.

Randy Fischer, known as the "Fish Man," testified to buying an ounce or more of cocaine from Van Daal Wyk at least ten times, also using the "fronting" method of inventory financing. Van Daal Wyk stored a safe in the pantry of Fish Man's home, telling Fish Man that he thought someone might be watching him. On January 12, 1985, when Fish Man wished to buy three ounces of cocaine, Van Daal Wyk went into the pantry and returned with the three ounces. That day Fish Man sold the three ounces to Daniel Layber, an undercover narcotics agent for Wisconsin's State Division of Criminal Investigation. The three ounces were later tested and found to contain cocaine, of undetermined purity. Fish Man had sold cocaine to Layber twice previously. On the third occasion, Layber arrested Fischer.

Van Daal Wyk told Davolis that he had lost a kilogram of cocaine because of Fish Man's arrest. He told Davolis further that the lost kilogram had been in a safe, and that he owed Brill about $40,000 for it. Van Daal Wyk told Buckner that he was "paranoid about the pressures that were being placed upon him" as a result of Fish Man's arrest and was considering absconding.

Brill told Buckner that Fish Man had been arrested and that Fish Man was a dealer for Van Daal Wyk. Brill said to "beware of Fish Man," because he might now be a government informant. He also told Buckner to instruct one Lenny Arnold not to distribute any cocaine to Van Daal Wyk: "he felt there was too much heat on him from the Fish Man bust." He further told Buckner that Van Daal Wyk owed him $30,000 for cocaine lost in a safe that the Fish Man had had.

Before Fish Man's arrest, Van Daal Wyk had told Davolis that he had bought a safe and intended to secure an apartment to use as a "safe house." A "safe house" is not simply a house used to store a safe: rather, it is a place used to store contraband that one does not wish to have about one's own abode. On January 24, 1985, Van Daal Wyk leased an apartment in Oshkosh, where he subsequently lived. The next day the apartment across the hall was leased to one "Sarah Winston." Van Daal Wyk on one occasion paid the monthly rent for both apartments, in cash.

The results of a search of "Sarah Winston's" apartment were consistent with its use as a safe house. Found were plastic bags with cocaine residue; empty containers of Inositol, a white powder used to "cut" (dilute to increase volume and thus profitability) cocaine; and an empty bag of latex gloves. Buckner identified the type of packaging material found as the type used by Brill in transporting cocaine. In the closet, part of the ceiling had been cut away and a piece of wood fastened to it like a handle, such that the space above could be used as a hiding place.

The manager of the apartment house testified as to what she saw in Van Daal Wyk's apartment. She found money wrappers with denominations written on them, a piece of paper with names and weights written on it, and a pamphlet about drug smuggling. She also found a balance scale. Scales are a necessity in the narcotics business. They also have other uses; the manager testified that she had had one in her apartment with fruit in it.

We note first that some of the out-of-court statements in the above narrative, although they would be hearsay if offered as proof of the truth of their content, could properly have been considered by the court for other purposes in deter-

mining whether the requirements of 801(d)(2)(E) were met. For example, Brill's statement that Van Daal Wyk owed him money for lost cocaine from the safe would be hearsay if offered to prove that Van Daal Wyk actually owed Brill money for cocaine. But this case was not an action by Brill to collect on the debt. Evidence of Brill's statement had probative value in showing Brill's knowledge of the cocaine and of the fact that it had been kept by Van Daal Wyk in a safe at Fish Man's home. Such knowledge on Brill's part supports the proposition that Brill and Van Daal Wyk were both members of the same conspiracy to distribute cocaine. The same reasoning applies to Brill's statement that Fish Man was a dealer for Van Daal Wyk. Until the court had determined that the 801(d)(2)(E) requirements were met, the statement could not be considered for the truth of its content. But in considering whether those requirements were met, it did have nonhearsay value for showing Brill's knowledge of the relationship between Fish Man and Van Daal Wyk. *See United States v. Magnus,* 743 F.2d 517 (7th Cir.1984); *United States v. Bobo,* 586 F.2d 355, 371–72 (5th Cir.1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1546, 59 L.Ed.2d 795 (1979); *United States v. Makhlouta,* 790 F.2d 1400 (9th Cir.1986).

Another statement of Brill's with nonhearsay value was the statement he made to Luker that he would have "Bill" contact him that evening for the purpose of cocaine sales. It had nonhearsay value both in showing his knowledge of and relationship with a dealer named "Bill" and in showing his present intention to contact that person in response to Luker's inquiry.

In a case where statements had value as nonhearsay but would otherwise be excludable as hearsay, there might be problems with admitting them into evidence because of Fed.R.Evid. 403: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." But this is not a case where the jury might take evidence admitted for a nonhearsay purpose and improperly give weight to its

hearsay assertion. *Cf. United States v. Magnus,* 743 F.2d 517, 522–23 (7th Cir. 1984). The question, whether the 801(d)(2)(E) requirements were met, was a legal question to be answered by the court. Once the court found that the 801(d)(2)(E) requirements were met, the statements were removed from the realm of hearsay and thus could be considered by the jury.

■ We turn to whether the district court was clearly erroneous in finding the requirements of 801(d)(2)(E) met. The first, the existence of a conspiracy to distribute cocaine, is clearly met. The existence of a conspiracy was established not only by Brill's out-of-court statements to Buckner and Luker, the nonhearsay value of which we have already identified, but also by Van Daal Wyk's own statements to Davolis and Buckner, which are covered by the exception to the hearsay definition for a party's own out-of-court statements. *See* Fed.R.Evid. 801(d)(2)(A). The second is a showing that Van Daal Wyk was a knowing participant in the conspiracy. "Once the government proves the existence of a conspiracy, the government need only offer 'slight evidence' to prove that an individual was a member of the conspiracy." *United States v. Castillo,* 814 F.2d 351, 353 (7th Cir.1987) (quoting *United States v. Gironda,* 758 F.2d 1201, 1217 (7th Cir.), *cert. denied,* 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985)).

■ The government must do more than simply show that the defendant associated with the conspirators. In *United States v. Williams,* 798 F.2d 1024 (7th Cir.1986), we held that there was insufficient evidence of a wife's participation in a conspiracy in which her husband played a part. Although she was present at various drug transactions and while others used drugs, that proved nothing more than that she acquiesced to her husband's dealings, not that she played an active role. To the same effect, see *United States v. West,* 670 F.2d 675 (7th Cir.), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982) and *United States v. Quintana,* 508 F.2d 867 (7th Cir.1975).

In this case, however, there was evidence showing a much closer connection than mere association between Brill and Van Daal Wyk. Mere association was shown by the fact that the two played on the same darts team, that Van Daal Wyk was in photos found at Brill's, and that Buckner met Van Daal Wyk at Brill's birthday party. Beyond that there was ample evidence that Brill was dealing cocaine on the wholesale level and that Van Daal Wyk was moving it in smaller quantities. Van Daal Wyk needed to be supplied by someone, and there was sufficient evidence for the court to conclude that that someone was Brill.

Van Daal Wyk said that, because of Fish Man's arrest, he owed Brill money for a lost kilogram of cocaine that had been in the Fish Man's safe. Brill's statements showed that he had the same understanding of the situation, indicating communication between the two on the matter. Van Daal Wyk also said that the arrest had caused him pressures that made him feel "paranoid." Brill reacted to the arrest by ordering that Van Daal Wyk be given no cocaine. Brill's promise to refer potential customer Luker to "Bill," followed by Van Daal Wyk's timely appearance, further support the proposition that the two were in business together.

The court could have concluded that the apartment leased to "Sarah Winston" was used by Van Daal Wyk as the safe house he spoke of obtaining. He paid rent on the apartment and it was leased the day after he leased his own, neighboring apartment. In the "Sarah Winston" apartment were found not just materials indicating that it was used in cocaine trafficking, but the same sort of packing material that Brill used. All this takes this case far beyond the sort of mere association in *Williams*. *See Kaden*, 819 F.2d at 819–20. The second requirement of 801(d)(2)(E), "slight evidence" showing Van Daal Wyk's participation in the conspiracy, is thus met.

■ As to some of the statements, Van Daal Wyk contends that they do not meet the third requirement of 801(d)(2)(E), that they were made in furtherance of the conspiracy. As noted above, Buckner testified to an out-of-court statement by Brill that Van Daal Wyk owed him $30,000 for the lost kilogram of cocaine from the safe left at Fish Man's residence. Buckner also testified that at that time Brill said that Van Daal Wyk was one of his dealers. Van Daal Wyk argues that these statements were mere idle discussion, rather than statements made in furtherance of the conspiracy.

Regarded within their context, Brill's statements furthered the objectives of the conspiracy. According to Buckner's testimony, he and Brill had a conversation in Oblio's Bar in Oshkosh. Brill told him that Fish Man was a dealer for Van Daal Wyk who had been arrested. Then Brill said that Van Daal Wyk, in turn, was a dealer for Brill. He told Buckner to beware of Fish Man, because he might now be working as an informant. He also instructed Buckner to call Lenny Arnold and tell him not to give any more cocaine to Van Daal Wyk. Brill stated that he did not want Van Daal Wyk dealing at that time because "there was too much heat on him from the Fish Man bust." He wanted "things to cool down for a while." Brill also told Buckner that Van Daal Wyk owed him $30,000 for the lost cocaine from the safe.

Brill was taking prophylactic measures, seeking to control the damage to the ongoing conspiracy. In order to be able to instruct Buckner to tell Arnold to cut off Van Daal Wyk's cocaine supply, he quite logically told Buckner that Van Daal Wyk was one of his dealers. It was also useful for him to inform Buckner that Van Daal Wyk owed him money and why. Together with the fact that one of Van Daal Wyk's dealers had recently been arrested, that information would help Buckner better understand why Van Daal Wyk's supply should be cut off, at least temporarily. The statements were not made in superfluous causerie; they were part of the information flow between conspirators intended to help each perform his role. *See United States v. Norman Potts*, 840 F.2d 368, 370–71 (7th Cir.1987).

## II

Van Daal Wyk makes a number of other arguments, some in quite cursory fashion, each of which we have carefully considered and found nonmeritorious. We will briefly address two.

Buckner testified that he received one thousand dollars payment for each trip he made for Brill. In the presentencing report, it was written, on the basis of interviews with Buckner, that he received one thousand dollars for each kilogram of cocaine transported. That report also referred to a trip in which Buckner delivered forty kilograms of cocaine for Brill: Buckner did not mention such a trip during his trial testimony. The trial court denied Van Daal Wyk's post-trial motion for a new trial. Van Daal Wyk argues, "These two facts, if known to the jury, and to the defense counsel may well have effected[sic] the outcome of the case against Van Daaly[sic] Wyk by destroying the credibility of one of the prosecution's essential witnesses."

The general standard for determining whether newly discovered evidence warrants a new trial is the following:

The defendant[sic] must show that the evidence (1) came to their knowledge only after trial; (2) could not have been discovered sooner had defendants exercised due diligence; (3) is material, and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a retrial.

*United States v. Nero*, 733 F.2d 1197, 1202 (7th Cir.1984) (quoting *United States v. Oliver*, 683 F.2d 224, 228 (7th Cir.1982)). This court has formulated a more specific standard in situations where the newly discovered evidence purports to refute false trial testimony:

(a) The court is reasonably well satisfied that the testimony given by a material witness is false. (b) That the jury *might* have reached a different conclusion. (c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

*Nero*, 733 F.2d at 1202 (quoting *Larrison v. United States*, 24 F.2d 82 (7th Cir.1928)).

The new evidence in this case would clearly not meet the first, general standard. The new evidence is "merely impeaching" (and impeaching on the most collateral of matters) and thus would not meet the third prong. The fourth prong, which requires that the new evidence would probably lead to an acquittal on retrial, would also be a stumbling block.

As to the *Larrison* standard, the court held that the first requirement, that it be reasonably well satisfied that the testimony at trial was false, was not met because the discrepancy could have resulted either from miscommunication between Buckner and the preparer of the report or from a lapse in Buckner's recollection. The court was not convinced that the testimony at trial was incorrect, and it was entitled so to hold.

The court considered, in the alternative, whether the second prong, that the jury "might" have reached a different conclusion, was met. "As to the second element, 'that the jury might have reached a different conclusion,' the Court admits that it is troubled by the nebulous nature of the 'might have' standard. Taken literally, any difference in evidence presented at a new trial, regardless of how whimsically one conjures a difference, 'might' result in a jury reaching a different conclusion." We share the district court's concern. *Larrison* cannot be interpreted to mean that false testimony will require a new trial if it is at all possible that a jury could reach a different result: a different jury "might" reach a different result even if the evidence presented was the same. The likelihood that the false testimony played a determinative or substantial role in the jury's verdict must be greater than that, although less than the general standard that, on retrial, the new evidence would probably lead to acquittal. We do not today further define the *Larrison* standard, but simply hold that it was clearly not met here. To say that the jury would have acquitted Van Daal Wyk if it had been told that Buckner received greater remuneration for his trips

on Brill's behalf would be the wildest speculation. The link between that and Van Daal Wyk's action was extremely remote.

■ Finally, Van Daal Wyk claims that his right under the Sixth Amendment to an impartial jury was violated because the government excluded two black potential jurors with peremptory challenges. The Supreme Court recently held that a defendant may establish a prima facie equal protection violation showing "that he is a member of a cognizable racial group [citation omitted] and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986). Van Daal Wyk is white. Apparently recognizing that *Batson* by its terms would thus not apply, he contended in his brief that under the same rationale the government's use of its peremptory challenges denied him the right under the Sixth Amendment to a jury drawn from a fair cross-section of the community. Recently, however, this court sitting en banc held that the Sixth Amendment fair cross-section requirement places no limits on the use of peremptory challenges. *Teague v. Lane,* 820 F.2d 832, 843 (7th Cir.1987). Counsel for Van Daal Wyk did not press this issue at oral argument. *Teague* mandates that it has no merit.

### III

For the foregoing reasons, the judgment of the district court is

AFFIRMED.