UNITED STATES of America,
Plaintiff–Appellee,

v.

Lynnette HARRIS and Leigh
Ann Conley, Defendants–
Appellants.

Nos. 90–2721, 90–2974.

United States Court of Appeals,
Seventh Circuit.

Argued May 9, 1991.

Decided Aug. 30, 1991.

 

 

 
 
 
 
 
 
 
 

 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

Mel S. Johnson, Asst. U.S. Atty. (argued), Milwaukee, Wis., for U.S.

Dennis P. Coffey (argued), Coffey, Coffey & Geraghty, Milwaukee, Wis., for Lynnette Harris.

Aaron Starobin (argued), Starobin & Associates, Thiensville, Wis., for Leigh Ann Conley.

Before CUDAHY and FLAUM, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

David Kritzik, now deceased, was a wealthy widower partial to the company of young women. Two of these women were Leigh Ann Conley and Lynnette Harris, twin sisters. Directly or indirectly, Kritzik gave Conley and Harris each more than half a million dollars over the course of several years. For our purposes, either Kritzik had to pay gift tax on this money or Harris and Conley had to pay income tax. The United States alleges that, beyond reasonable doubt, the obligation was Harris and Conley's. In separate criminal trials, Harris and Conley were convicted of willfully evading their income tax obligations regarding the money,[1] and they now appeal.

Under *Commissioner v. Duberstein,* 363 U.S. 278, 285, 80 S.Ct. 1190, 1196, 4 L.Ed.2d 1218 (1960), the donor's intent is the "critical consideration" in distinguishing between gifts and income. We reverse Conley's conviction and remand with instructions to dismiss the indictment against her because the government failed to present sufficient evidence of Kritzik's intent regarding the money he gave her. We also reverse Harris' conviction. The district court excluded as hearsay letters in which Kritzik wrote that he loved Harris and enjoyed giving things to her. These letters were central to Harris' defense that she

---

1. Harris was sentenced to ten months in prison, to be followed by two months in a halfway house and two years of supervised release. She was also fined $12,500.00 and ordered to pay a $150.00 special assessment. Conley was sentenced to five months in prison, followed by five months in a halfway house and one year supervised release. She was also fined $10,000.00 and ordered to pay a $100.00 assessment.

believed in good faith that the money she received was a nontaxable gift, and they were not hearsay for this purpose.

We do not remand Harris' case for retrial, however, because Harris had no fair warning that her conduct might subject her to criminal tax liability. Neither the tax code, the Treasury Regulations, or Supreme Court or appellate cases provide a clear answer to whether Harris owed any taxes or not. The closest authority lies in a series of Tax Court decisions—but these cases *favor* Harris' position that the money she received was not income to her. Under this state of the law, Harris could not have formed a "willful" intent to violate the statutes at issue. For this reason, we remand with instructions that the indictment against Harris be dismissed. The same conclusion applies to Conley, and provides an alternative basis for reversing her conviction and remanding with instructions to dismiss the indictment.

### Insufficiency of the Evidence as to Conley

■ Conley was convicted on each of four counts for violating 26 U.S.C. § 7203, which provides,

Any person ... required ... to make a [tax] return ... who willfully fails to ... make such return ... shall, in addition to other penalties provided by law, be guilty of a misdemeanor....

Conley was "required ... to make a return" only if the money that she received from Kritzik was income to her rather than a gift.[2] Assuming that the money was income, she acted "willfully," and so is subject to criminal prosecution, only if she knew of her duty to pay taxes and "voluntarily and intentionally violated that duty." *Cheek v. United States,* —— U.S. ——, 111 S.Ct. 604, 610, 112 L.Ed.2d 617 (1991). The government met its burden of proof if the

jury could have found these elements beyond a reasonable doubt, viewing the evidence in the light most favorable to the government. *See, e.g., United States v. Lamon,* 930 F.2d 1183, 1190 (7th Cir.1991).

■ The government's evidence was insufficient to show either that the money Conley received was income or that she acted in knowing disregard of her obligations. "Gross income" for tax purposes does not include gifts, which are taxable to the donor rather than the recipient. 26 U.S.C. §§ 61, 102(a), 2501(a). In *Commissioner v. Duberstein,* 363 U.S. 278, 285, 80 S.Ct. 1190, 1196–97, 4 L.Ed.2d 1218 (1960), the Supreme Court stated that in distinguishing between income and gifts the "critical consideration ... is the transferor's intention." A transfer of property is a gift if the transferor acted out of a "detached and disinterested generosity, ... out of affection, respect, admiration, charity, or like impulses." *Id.* By contrast, a transfer of property is income if it is the result of "the constraining force of any moral or legal duty, constitutes a reward for services rendered, or proceeds from the incentive of anticipated benefit of an economic nature."

■ Regarding the "critical consideration" of the donor's intent, the only direct evidence that the government presented was Kritzik's gift tax returns. On those returns, Kritzik identified gifts to Conley of $24,000, $30,000, and $36,000 for the years 1984–6, respectively, substantially less than the total amount of money that Kritzik transferred to Conley. This leaves the question whether Kritzik's other payments were taxable income to Conley or whether Kritzik just underreported his gifts. The gift tax returns raise the ques-

---

**2.** A side issue in this case concerns testimony that the United States presented from an insurance adjustor who handled a claim that Conley filed. According to the adjustor, Conley told him that she had filed tax returns during the years at issue, and had about $35,000 in income as a model during those years. The United States presented no other evidence, however, corroborating this modelling income. The ad-

justor's unsupported testimony, on a matter that had nothing to do with his handling of the insurance matter, is not enough to support a conviction based on the supposed modelling fees. Conley also had some interest income for the years at issue, but this income, by itself, was not enough to trigger an obligation to pay taxes. *See* Trial Transcript, pp. 358–9.

tion, they do not resolve it.[3]

This failure to show Kritzik's intent is fatal to the government's case. Without establishing Kritzik's intent, the government cannot establish that Conley had any obligation to pay income taxes. Further, Conley could not have "willfully" failed to pay her taxes unless she knew of Kritzik's intent. Even if Kritzik's gift tax returns proved anything, the government presented *no* evidence that Conley knew the amounts that Kritzik had listed on those returns. Absent proof of Kritzik's intent, and Conley's knowledge of that intent, the government has no case.

The government's remaining evidence consisted of a bank card that Conley signed listing Kritzik in a space marked "employer" and testimony regarding the form of the payments that Conley received. The bank card is no evidence of Kritzik's intent and even as to Conley is open to conflicting interpretations—she contends that she listed Kritzik as a reference and no more. As to the form of the payments, the government showed that Conley would pick up a regular check at Kritzik's office every week to ten days, either from Kritzik personally or, when he was not in, from his secretary. According to the government, this form of payment is that of an employee picking up regular wages, but it could just as easily be that of a dependent picking up regular support checks.

We will "not permit a verdict based solely upon the piling of inference upon inference." *United States v. Balzano,* 916 F.2d

1273, 1284 (7th Cir.1990). In this regard, we emphasize the indirect, inconclusive nature of the evidence in establishing Kritzik's intent. We further emphasize that the gift tax returns and the bank card speak for themselves—the jury heard no testimony that would enable them to make a credibility determination based on information that is unavailable to the Court. Similarly, the fact that Conley received checks at fairly regular intervals was not in dispute, and the presentation of that evidence through the testimony of Kritzik's former secretary could not have provided the jury with additional insight. *Cf. United States v. DeCorte,* 851 F.2d 948 (7th Cir.1988) (suggesting that a challenge to the sufficiency of the evidence rests on "firmer legal ground" when no credibility determinations are at issue).

This Court's decision in *United States v. Delay,* 440 F.2d 566 (7th Cir.1971) provides a close analogy. In *Delay,* the government sought to prove that the defendant had knowingly participated in the sale of stolen cars. The main evidence was the defendant's endorsement on the checks that were payment for the sales at issue. With certain vague testimony, this endorsement would have supported the inference that the defendant knowingly participated in the sales. But this evidence was also consistent with the contrary inference. *Id.,* p. 568. This Court reversed because "[w]here the evidence as to an element of a crime is equally consistent with a theory of innocence as a theory of guilt, that evidence

---

**3.** Our discussion assumes that the gift tax returns were admissible as evidence because the parties have not raised the issue. We note, however, that the returns appear on their face to be hearsay. The government used the returns (out of court statements) to prove that Kritzik's gifts were the amount that he reported (that is, to prove the truth of the matter asserted). *See* Fed.R.Evid. 801(c). Nor does the public records exception to the hearsay rule in Fed.R.Evid. 803(8) appear to apply, given that the information on the return reflects neither "the activities of [an] office or agency" nor "matters observed [by the office or agency] pursuant to duty imposed by law." *See Nachtsheim v. Beech Aircraft Corp.,* 847 F.2d 1261, 1273 (7th Cir.1988) (public records exception requires personal knowledge by a public official of the facts contained in the record).

Along these lines, the United States tried to present direct evidence of Kritzik's intent in the form of an affidavit that he provided IRS investigators before his death. In the affidavit, Kritzik stated that he regarded both Harris and Conley as prostitutes. But Kritzik had an obvious motive to lie to the investigators—he could have been subject to civil or criminal penalties for failure to pay gift taxes if he failed to shift the tax burden to the sisters. The District Court was correct to exclude this affidavit under the hearsay rule and under the confrontation clause. In general, evidentiary difficulties such as this will often be insurmountable in trying to prove a willful tax violation that hinges on the intent of a dead person. The civil remedies available to the IRS will almost always lead to surer justice in such cases than criminal prosecution.

necessarily fails to establish guilt beyond a reasonable doubt." *Id.*

Similarly, in the present case, the bare facts of Kritzik's gift tax return, the bank card, and the form of the payments are as consistent with an inference of innocence as one of guilt. The evidence does not support a finding of guilt beyond a reasonable doubt, and we reverse Conley's conviction and remand with instructions to dismiss the indictment against her.

### The Admissibility of Kritzik's Letters

■ Harris was convicted of two counts of willfully failing to file federal income tax returns under 26 U.S.C. § 7203 (the same offense for which Conley was convicted) and two counts of willful tax evasion under 26 U.S.C. § 7201.[4] At trial, Harris tried to introduce as evidence three letters that Kritzik wrote, but the District Court excluded the letters as hearsay. The District Court also suggested that the letters would be inadmissible under Fed.R.Evid. 403 because the possible prejudice from the letters exceeded their probative value. We hold that the letters were not hearsay because they were offered to prove Harris' lack of willfulness, not for the truth of the matters asserted. We further hold that the critical nature of the letters to Harris' defense precludes their exclusion under Rule 403, and so reverse her conviction.

The first of the letters at issue was a four page, handwritten letter from Kritzik to Harris, dated April 4, 1981. In it, Kritzik wrote that he loved and trusted Harris and that, "so far as the things I give you are concerned—let me say that I get as great if not even greater pleasure in giving than you get in receiving." Def.Ex. 201, p. 2. He continued, "I love giving things to you and to see you happy and enjoying them." *Id.* In a second letter to Harris of the same date, Kritzik again wrote, "I ... love you very much and will do all that I can to make you happy," and said that he would arrange for Harris' financial security. Def.Ex. 202, p. 3. In a third letter, dated some six years later on May 28, 1987, Kritzik wrote to his insurance company regarding the value of certain jewelry that he had "given to Ms. Lynette Harris as a gift." Kritzik forwarded a copy of the letter to Harris.

These letters were hearsay if offered for the truth of the matters asserted—that Kritzik did in fact love Harris, enjoyed giving her things, wanted to take care of her financial security, and gave her the jewelry at issue as a gift. But the letters were not hearsay for the purpose of showing what Harris believed, because her belief does not depend on the actual truth of the matters asserted in the letters. Even if Kritzik were lying, the letters could have caused Harris to believe in good faith that the things he gave her were intended as gifts. *See generally,* Fed.R.Evid. 801(a); *United States v. Mejia,* 909 F.2d 242, 247 (7th Cir.1990). This good faith belief, in turn, would preclude any finding of willfullness on her part.[5]

■ In general, hearsay problems like this—evidence being admissible for one purpose but not for another—still leave the District Court discretion. Jurors are not robots, after all, and can rarely consider evidence strictly for a single purpose to the exclusion of other, often more obvious purposes. For this reason, we will usually defer to a trial judge's conclusion that, under Fed.R.Evid. 403, otherwise admissi-

---

**4.** 26 U.S.C. § 7201 provides:

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony. . . .

**5.** Besides arguing that the letters were not hearsay, Harris urges that the letters are a statement of Kritzik's "then existing state of mind", and so come within the hearsay exception in Fed. R.Evid. 803(3). This Court has held, however, that for evidence to be admissible under Rule

803(3), "it must be shown that the declarant had no time to reflect, that is, no time to fabricate or misrepresent his thoughts." *United States v. Carter,* 910 F.2d 1524, 1530 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1628, 113 L.Ed.2d 724 (1991); *United States v. Jackson,* 780 F.2d 1305, 1315 (7th Cir.1986). The act of letter writing usually provides as much time as the writer might want to fabricate or misrepresent his thoughts, so this exception does not apply in this case.

ble evidence is likely to do more harm than good. *See, e.g., United States v. Van Daal Wyk*, 840 F.2d 494, 498 (7th Cir.1988) (cautioning that "where statements had value as nonhearsay but would otherwise be excludable as hearsay, there might be problems with admitting them into evidence because of Fed.R.Evid. 403").

■ In this case, however, the letters were too important to Harris' defense to be excluded. Her belief about Kritzik's intent decides the issue of willfulness, which is an element of the offense, and she had no other objective means of proving that belief. True, admitting the letters would probably lead to some prejudice to the government's case. The jury would be hard pressed to consider the letters only for the permissible issue of what Harris thought of Kritzik's intent, and not for the impermissible issue of what Kritzik actually intended. The alternative, however, is to strip Harris of evidence that we believe was essential to a fair trial. In these circumstances, we hold that the District Court abused its discretion in excluding the letters and so reverse Harris' conviction.

### The Tax Treatment of Payments to Mistresses

■ Our conclusion that Harris should have been allowed to present the letters at issue as evidence would ordinarily lead us to remand her case for retrial. We further conclude, however, that current law on the tax treatment of payments to mistresses provided Harris no fair warning that her conduct was criminal. Indeed, current authorities favor Harris' position that the money she received from Kritzik was a gift. We emphasize that we do not necessarily agree with these authorities, and that the government is free to urge departure from them in a *non*criminal context. But new points of tax law may not be the basis of criminal convictions. For this reason, we remand with instructions that the indictment against Harris be dismissed. Although we discuss only Harris' case in this section, the same reasoning applies to Conley and provides an alternative basis for dismissal of the indictment against her.

Again, the definitive statement of the distinction between gifts and income is in the Supreme Court's *Duberstein* decision, which applies and interprets the definition of income contained in 26 U.S.C. §§ 61. But as the Supreme Court described, the *Duberstein* principles are "necessarily general." It stated, " 'One struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up ... is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle.' " *Id., quoting Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). Along these lines, Judge Flaum's concurrence properly characterizes *Duberstein* as "eschew[ing] ... [any] categorical, rule-bound analysis" in favor of a "case-by-case" approach. Concurrence, at 1135–1136.

■ *Duberstein* was a civil case, and its approach is appropriate for civil cases. But criminal prosecutions are a different story. These must rest on a violation of a clear rule of law, not on conflict with a "way of life". If "defendants [in a tax case] ... could not have ascertained the legal standards applicable to their conduct, criminal proceedings may not be used to define and punish an alleged failure to conform to those standards." *United States v. Mallas*, 762 F.2d 361, 361 (4th Cir.1985). This rule is based on the Constitution's requirement of due process and its prohibition on *ex post facto* laws; the government must provide reasonable notice of what conduct is subject to criminal punishment. *See id.,* at 363; *see also Kucharek v. Hanaway*, 902 F.2d 513, 518 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991). The rule is also statutory in tax cases, because only "willful" violations are subject to criminal punishment. *Mallas*, 762 F.2d at 363; *see Cheek v. United States,* —— U.S. ——, 111 S.Ct. 604, 610, 112 L.Ed.2d 617 (1991). In the tax area, "willful" wrongdoing means the "voluntary, intentional violation of a known"—and therefore knowable—"legal duty." *Cheek*, 111 S.Ct. at 610, *quoting*

**1132**

*United States v. Bishop,* 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973). If the obligation to pay a tax is sufficiently in doubt, willfulness is impossible as a matter of law, and the "defendant's actual intent is irrelevant." *United States v. Garber,* 607 F.2d 92, 98 (5th Cir.1979) (en banc), *quoting United States v. Critzer,* 498 F.2d 1160, 1162 (4th Cir.1974.)[6]

We do not doubt that *Duberstein*'s principles, though general, provide a clear answer to many cases involving the gift versus income distinction and can be the basis for civil as well as criminal prosecutions in such cases. We are equally certain, however, that *Duberstein* provides no ready answer to the taxability of transfers of money to a mistress in the context of a long term relationship. The motivations of the parties in such cases will always be mixed. The relationship would not be long term were it not for some respect or affection. Yet, it may be equally clear that the relationship would not continue were it not for financial support or payments.

Usually, a tax decision by the Supreme Court does not stand by itself. Treasury Regulations add specifics to broad principles, and federal cases apply the broad principles and prevailing regulations to the facts of particular cases. But these usual sources of authority are silent when it comes to the tax treatment of money transferred in the course of long term, personal relationships. No regulations cover the subject, and we have found no appellate or district court cases on the issue.

The most pertinent authority lies in several civil cases from the Tax Court, but these cases *favor* Harris' position. At its strongest, the government's case against Harris follows the assertions that Harris made, but now repudiates, in a lawsuit she filed against Kritzik's estate. According to her sworn pleadings in that suit, "all sums of money paid by David Kritzik to Lynette Harris ... were made ... in pursuance with the parties' express oral agreement." Government Exhibit 22, p. 4. As Harris' former lawyer testified at her trial, the point of this pleading was to make out a

**6.** *See also James v. United States,* 366 U.S. 213, 221–22, 81 S.Ct. 1052, 1056–57, 6 L.Ed.2d 246 (1961). In *James,* the Supreme Court held that embezzled funds are income to the recipient, formally overruling its prior decision in *Commissioner v. Wilcox,* 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752 (1946), a case that had been all but overruled in *Rutkin v. United States,* 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833 (1952). A plurality of the *James* Court decided that its new holding would only apply prospectively, and reversed the defendant's conviction because "the element of willfulness *could not* be proven in a criminal prosecution" given the unsettled state of the case law, apparently regardless of the defendant's actual reliance on that case law. *Id.,* 366 U.S. at 221–22, 81 S.Ct. at 1057 (emphasis added). On this point, the plurality was joined by Justices Black and Douglas, forming a majority. *Id.,* at 224, 81 S.Ct. at 1058; *see United States v. Garber,* 607 F.2d 92, 98–99 & n. 4 (5th Cir.1979) (en banc) (discussing *James*).

We further note that the *Garber* decision cited above and in the text raises an issue regarding the role of the jury in determining whether a principle of tax law is doubtful or not. In our view, the doubtfulness of a tax law can influence a criminal trial in two ways. The law can be objectively ambiguous, as in the present case, so that it fails to provide fair notice as a matter of law. A claim of objective ambiguity requires that the court examine all of the relevant precedents and dismiss the indictment if it concludes

that the tax obligation is ambiguous as a matter of law. Alternatively, the defendant or the defendant's tax advisors may have subjectively, but wrongly, seen an ambiguity. In such a case, the defendant may present evidence to the jury showing the basis for the defendant's allegedly good faith belief. Necessarily, this evidence may include expert testimony about case law, to the extent that the defendant claims actual reliance on that case law. Case law on which the defendant did not in fact rely is irrelevant because only the defendant's subjective belief is at issue.

Both the objective and subjective elements were discussed in *Garber,* with some overlap. Certain language in the opinion suggests that expert testimony about tax law was appropriate in that case if the testimony "support[ed] Garber's [subjective] feelings," without any express requirement that Garber actually have relied on this advice. 607 F.2d at 99. Subsequent courts, including a panel of the Fifth Circuit, have declined to follow this language in *Garber,* and have instead taken positions regarding the role of the jury that are consistent with our analysis. *See United States v. Herzog,* 632 F.2d 469, 473 (5th Cir.1980); *see also United States v. Curtis,* 782 F.2d 593, 598–600 (6th Cir.1986); *United States v. Mallas,* 762 F.2d 361, 364 n. 4 (4th Cir.1985); *United States v. Ingredient Technology Corp.,* 698 F.2d 88, 96–97 (2d Cir.), *cert. denied,* 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983).

"palimony" claim under the California Supreme Court's decision in *Marvin v. Marvin,* 18 Cal.3d 660, 134 Cal.Rptr. 815, 557 P.2d 106 (1976). Yet, the Tax Court has likened *Marvin*-type claims to amounts paid under antenuptial agreements. Under this analysis, these claims are *not* taxable income to the recipient:

> In an antenuptial agreement the parties agree, through private contract, on an arrangement for the disposition of their property in the event of death or separation. *Occasionally, however, the relinquishment of marital rights is not involved. These contracts are generally enforceable under state contract law. See Marvin v. Marvin, 18 Cal.3d 660 [134 Cal.Rptr. 815], 557 P.2d 106 (1976).* Nonetheless, transfers pursuant to an antenuptial agreement are generally treated as gifts between the parties, because under the gift tax law the exchanged promises are not supported by full and adequate consideration, in money or money's worth.

*Green v. Commissioner,* T.C. Memo 1987–503 (emphasis added). We do not decide whether *Marvin*-type awards or settlements are or are not taxable to the recipient. The only point is that the Tax Court has suggested they are not. Until contrary authority emerges, no taxpayer could form a willful, criminal intent to violate the tax laws by failing to report *Marvin*-type payments. Reasonable inquiry does not yield a clear answer to the taxability of such payments.

Other cases only reinforce this conclusion. *Reis v. Commissioner,* T.C. Memo 1974–287 is a colorful example. The case concerned the tax liability of Lillian Reis, who had her start as a 16 year old nightclub dancer. At 21, she met Clyde "Bing" Miller when he treated the performers in the nightclub show to a steak and champagne dinner. As the Tax Court described it, Bing passed out $50 bills to each person at the table, on the condition that they leave, until he was alone with Reis. Bing then offered to write a check to Reis for any amount she asked. She asked for $1,200 for a mink stole and for another

check in the same amount so her sister could have a coat too.

The next day the checks proved good; Bing returned to the club with more gifts; and "a lasting friendship developed" between Reis and Bing. For the next five years, she saw Bing "every Tuesday night at the [nightclub] and Wednesday afternoons from approximately 1:00 p.m. to 3:00 p.m. ... at various places including ... a girl friend's apartment and hotels where [Bing] was staying." He paid all of her living expenses, plus $200 a week, and provided money for her to invest, decorate her apartment, buy a car, and so on. The total over the five years was more than $100,000. The Tax Court held that this money was a gift, not income, despite Reis' statement that she "earned every penny" of the money. Similarly, in *Libby v. Commissioner,* T.C. Memo 1969–184 (1969), the Tax Court accorded gift treatment to thousands of dollars in cash and property that a young mistress received from her older paramour. And in *Starks v. Commissioner,* T.C. Memo 1966–134, the Tax Court did the same for another young woman who received cash and other property from an older, married man as part of "a very personal relationship."

The Tax Court did find that payments were income to the women who received them in *Blevins v. Commissioner,* T.C. Memo 1955–211, and in *Jones v. Commissioner,* T.C. Memo 1977–329. But in *Blevins,* the taxpayer was a woman who practiced prostitution and "used her home to operate a house of prostitution" in which six other women worked. Nothing suggested that the money at issue in that case was anything other than payments in the normal course of her business. Similarly in *Jones,* a woman had frequent hotel meetings with a married man, and on "*each occasion*" he gave her cash. (emphasis added). Here too, the Tax Court found that the relationship was one of prostitution, a point that was supported by the woman's similar relationships with other men.

*If* these cases make a rule of law, it is that a person is entitled to treat cash and

property received from a lover as gifts, as long as the relationship consists of something more than specific payments for specific sessions of sex. What's more, even in *Blevins,* in which the relationship was one of raw prostitution, the Tax Court rejected the IRS' claim that a civil fraud penalty should be imposed. Nor was a fraud penalty applied in *Jones,* the other prostitution case, although there the issue apparently was not raised. The United States does not allege that Harris received specific payments for specific sessions of sex, so *Reis, Libby,* and *Starks* support Harris' position.

 Judge Flaum argues in his concurrence that these cases turn on their particular facts and do not make a rule of law. Concurrence, at 1135, 1136. Fair enough (although the cases do cite each other in a manner that suggests otherwise). We need not decide this issue. We only conclude that a reasonably diligent taxpayer is entitled to look at the reported cases with the most closely analogous fact patterns when trying to determine his or her liability. When, as here, a series of such cases favors the taxpayer's position, the taxpayer has not been put on notice that he or she is in danger of crossing the line into criminality by adhering to that position. These Tax Court cases can turn entirely on their facts, yet together show that the law provided no warning to Harris that she was committing a criminal act in failing to report the money that she received. It is also worth noting that Judge Flaum's argument has no application to the case of *Green v. Commissioner,* T.C. Memo 1987–503, which, as discussed at the start of this section, suggests that *Marvin*-type palimony payments are not taxable income as a matter of law.

Besides Harris' prior suit, the United States also presented evidence regarding the overall relationship between Harris and Kritzik. Testimony showed that Harris described her relationship with Kritzik as "a job" and "just making a living." Trial Transcript, p. 338. She reportedly complained that she "was laying on her back and her sister was getting all the money," described how she disliked when Kritzik fondled her naked, and made other derogatory statements about sex with Kritzik. *Id.,* at 232, 337.

This evidence still leaves Harris on the favorable side of the Tax Court's cases. Further, this evidence tells us only what Harris thought of the relationship. Again, the Supreme Court in *Duberstein* held that the *donor's* intent is the "critical consideration" in determining whether a transfer of money is a gift or income. *Commissioner v. Duberstein,* 363 U.S. 278, 285, 80 S.Ct. 1190, 1197, 4 L.Ed.2d 1218 (1960). If Kritzik viewed the money he gave Harris as a gift, or if the dearth of contrary evidence leaves doubt on the subject, does it matter how mercenary Harris' motives were? *Duberstein* suggests that Harris' motives may not matter, but the ultimate answer makes no difference here. As long as the answer is at least a close call, and we are confident that it is, the prevailing law is too uncertain to support Harris' criminal conviction.

 Finally, the evidence showed Harris to be a thief and to have evaded her tax obligations regarding *other* money. The thievery occurred when Kritzik offered to pay for extensive remodelling of a house that he had bought for Harris. Harris inflated the bills that she submitted to him for payment by more than a hundred thousand dollars, and funnelled her "profit" through a paper corporation that she had set up. The law is clear that embezzled or fraudulently obtained funds are income to the recipient. *See James v. United States,* 366 U.S. 213, 221–22, 81 S.Ct. 1052, 1056–57, 6 L.Ed.2d 246 (1961); *Cooper v. Commissioner,* T.C. Memo 1991–138; *see also* Treas.Reg. § 1.61–14(a) (as amended 1965). But the government has relied on Harris' theft only to illustrate the nature of Harris' relationship with Kritzik, not as an independent criminal act. *See* Consolidated Brief of the United States, p. 18. Along these lines, the government failed to request a jury instruction on point and failed to refer to any embezzled or misappropriated amounts in the indictment. The issue is waived. Similarly, the government presented evidence that, even apart from the money that she received from Kritzik,

Harris willfully failed to file returns in 1984. *See, e.g.,* Trial Transcript, pp. 608–13. Again, however, the government has not argued this point as an alternative basis for affirming the relevant count of Harris' conviction. The government based its case on the gift/income distinction, and its case must stand or fall on that distinction.

In short, criminal prosecutions are no place for the government to try out "pioneering interpretations of tax law." *United States v. Garber,* 607 F.2d 92, 100 (5th Cir.1979) (en banc). The United States has not shown us, and we have not found, a single case finding tax liability for payments that a mistress received from her lover, absent proof of specific payments for specific sex acts. Even when such specific proof is present, the cases have not applied penalties for civil fraud, much less criminal sanctions. The broad principles contained in *Duberstein* do not fill this gap. Before she met Kritzik, Harris starred as a sorceress in an action/adventure film. She would have had to be a real life sorceress to predict her tax obligations under the current state of the law.[7]

### Conclusion

For the reasons stated, we REVERSE Harris and Conley's convictions and remand with instructions to DISMISS the indictments against them.

**7.** Harris and Conley have already served most of the sentences under the convictions that we now reverse. This is an injustice, and requires at least a brief explanation.

To be released pending appeal of a criminal conviction, a defendant must show "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person" *and* "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in reversal or an order for a new trial." 18 U.S.C. § 3143(b).

This is an exacting standard. Harris and Conley's counsel performed well, but failed in their petitions for release pending appeal to draw the Court's attention to the unique nature of Harris and Conley's convictions under the prevailing tax cases. In Orders dated September 25, 1990 and October 26, 1990, the Court denied those petitions. We vacated those Orders on May 10, 1991, the day after oral argument, and ordered Harris and Conley's immediate release.

FLAUM, Circuit Judge, concurring.

The majority has persuasively demonstrated why Leigh Ann Conley's conviction is infirm and why the district court abused its discretion in excluding the Kritzik letters. I therefore join that portion of its opinion.

I further agree that Lynnette Harris' conviction must be reversed as well. To convict Harris for violating § 7201 and § 7203 of the Internal Revenue Code, the government had to establish beyond a reasonable doubt that Harris had a legal duty to file a tax return. *See United States v. Foster,* 789 F.2d 457, 460 (7th Cir.1986); *United States v. Dack,* 747 F.2d 1172, 1174 (7th Cir.1984); *United States v. Voorhies,* 658 F.2d 710, 713 (9th Cir.1981). It failed, in my view, to meet this burden; no reasonable juror could have found beyond a reasonable doubt that Kritzik's payments to Harris were income rather than gifts.

I am troubled, however, by the path the majority takes to reach this result, and thus concur only in the court's judgment with respect to the reversal of Harris' conviction. I part company with the majority when it distills from our gift/income jurisprudence a rule that would tax only the most base type of cash-for-sex exchange and categorically exempt from tax liability all other transfers of money and property to so-called mistresses or companions. Af-

In the future, counsel who believe that the Court should have granted a petition for release can assist the Court by renewing the petition in their main appellate briefs. Also, this Court's warnings to counsel against the "buckshot" approach of raising as many issues as possible, *see, e.g., United States v. Haddon,* 927 F.2d 942, 949 (7th Cir.1991), are particularly applicable to motions for release pending appeal. Finally, the district courts can assist us by stating in detail their reasons for denying a petition for release pending appeal, especially in a case like the present one in which the defendants posed no danger to the community and apparently negligible threat of flight. Necessarily, a district court's thorough knowledge of the merits of a case puts it in a better position to evaluate petitions for release than our Court, at least until the issues have been fully presented to the Court through briefing and oral argument.

ter citing several decisions of the tax court, the majority concludes that a person "is entitled to treat cash and property received from a lover as gifts, as long as the relationship consists of something more than specific payments for specific sessions of sex." *Ante* at 1133–1134. I respectfully disagree. In *Commissioner v. Duberstein*, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), the font of our analysis of the gift/income distinction, the Supreme Court expressly eschewed the type of categorical, rule-bound analysis propounded by the majority. *See id.* at 289, 80 S.Ct. at 1198 ("while the principles urged by the Government may, in nonabsolute form as crystallizations of experience, prove persuasive to the trier of facts in a particular case, neither they, nor any more detailed statement than has been made, can be laid down as a matter of law"). The Court counseled instead that in distinguishing gifts from income we should engage in a case-by-case analysis, the touchstone of which is "the 'transferor's intention.'" *Id.* at 285–86, 80 S.Ct. at 1197 (quoting *Bogardus v. Commissioner*, 302 U.S. 34, 43, 58 S.Ct. 61, 65, 82 L.Ed. 32 (1937)). After reading *Duberstein*, a reasonable taxpayer would conclude that payments from a lover were taxable as income if they were made "in return for services rendered" rather than "out of affection, respect, admiration, charity or like impulses." *Id.* at 285, 80 S.Ct. at 1197 (quoting *Robertson v. United States*, 343 U.S. 711, 714, 72 S.Ct. 994, 996, 96 L.Ed. 1237 (1952)).

Viewed in this light, I suggest that the bulk of the tax court cases cited by the majority offer no more than that the transferors in those particular cases harbored a donative intent. In my view, one cannot convincingly fashion a rule of law of general application from such a series of necessarily fact-intensive inquiries. That other taxpayers were found to have a donative intent does not bear on whether Harris had a duty to pay taxes on the monies she received from Kritzik. Whether Harris had such a duty is, under *Duberstein*, a question of Kritzik's intent, a question whose answer can be found only upon analysis of her particular circumstances.

If Kritzik harbored a donative intent, then Harris was not obligated to pay taxes on his largess; if, however, he did not—if he was paying Harris for her services—then she was under a duty to do so.

It appears that the majority at once agrees and disagrees with this analysis. The majority acknowledges, *ante* at 1132, that *Duberstein's* principles "though general, provide a clear answer to many cases involving the gift versus income distinction and can be the basis for civil as well as criminal prosecutions in such cases." The majority is "equally certain," however, that "*Duberstein* provides no ready answer to the taxability of transfers of money to a mistress in the context of a long-term relationship." *Ante* at 1132. It takes this view because tax court cases have characterized similar payments made to other mistresses and companions as gifts rather than income. While apparently nodding to *Duberstein*, the majority contends that the state of the law is such that no reasonable mistress or companion could *ever*, with sufficient certainty, conclude that the payments she received were income rather than gifts and hence taxable.

How the majority can agree that the focal point of our inquiry is properly the transferor's intent and yet establish what amounts to a rule of law effectively preempting such inquiries I find perplexing. Putting aside this problem, I am unpersuaded by the majority's argument that *Duberstein's* guidance is categorically no guidance at all. Consider the following example. A approaches B and offers to spend time with him, accompany him to social events, and provide him with sexual favors for the next year if B gives her an apartment, a car, and a stipend of $5,000 a month. B agrees to A's terms. According to the majority, because this example involves a transfer of money to a "mistress in the context of a long-term relationship", A could never be charged with criminal tax evasion if she chose not to pay taxes on B's stipend. I find this hard to accept; what A receives from B is clearly income as it is "in return for services rendered." 363 U.S. at 285, 80 S.Ct. at 1197. To be sure, there

will be situations—like the case before us—where the evidence is insufficient to support a finding that the transferor harbored a "cash for services" intent; in such cases, criminal prosecutions for willful tax evasion will indeed be impossible as a matter of law. That fact does not, however, condemn as overly vague the analysis itself.

I am thus prompted to find Harris' conviction infirm because of the relative scantiness of the record before us, not because mistresses are categorically exempt from taxation on the largess they receive. Simply put, the record before us does not establish beyond a reasonable doubt that Kritzik's intent was to pay Harris for her services, rather than out of affection or charitable impulse. As the majority relates, the record does contain evidence showing that Harris thought their relationship to be of the "cash-for-services" kind. Such evidence is, in my view, probative—to some degree—of Kritzik's intent. *See Olk v. United States*, 536 F.2d 876, 879 (9th Cir.1976) ("The manner in which a [transferee] may regard [that which is transferred] is, of course, not the touchstone for determining whether the receipt is excludable from gross income. It is, however, a reasonable and relevant inference."). But not sufficiently so to support a criminal conviction. Absent even a scintilla of direct evidence of Kritzik's intent, I cannot conclude, on the basis of Harris' perception of the relationship alone, that the government proved the nature of Kritzik's payments to be income rather than gift beyond a reasonable doubt.